**FILED**
**Mar 6, 2024, 8:01 PM**
**in the Clerk's Office**
**U.S. District Court,**
**EDNY, Brooklyn**
**Pro Se Office via**
**Box.com**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____x

**MARIA RUSCELLI**,

       Plaintiff

-against-

**THE DEPARTMENT OF EDUCATION**
**OF THE CITY OF NEW YORK,**

       Defendants

_____X

**DECLARATION OF**
**PLAINTIFF ON THE**
**EXHIBITS SUBMITTED IN**
**HER CASE AS MATERIAL FACTS**
**PURSUANT TO RULE 12(b)(6)**

**DOCKET No. 23-CV-07475(AMD)(LB)**

Maria Ruscelli declares as follows, pursuant to 28 U.S.C. §1746:

1. My name is Maria Ruscelli and I am the Plaintiff Pro Se in the case cited in the caption above currently in the U.S.D.C. Eastern District with docket #23-CV-07475.

2. I respectfully submit this Declaration in support of my Complaint and all papers in my case which argue undisputed facts, pursuant to Rule 12(b)(6). I have annexed the following documents in support of my Complaint:

   - **EXHIBIT A**:  EEOC Right To Sue Letter dated July 7, 2023

   - **EXHIBIT B**: Religious Exemption Appeal Determination dated March 7, 2022

   - **EXHIBIT C**: scher Letter re Scheinman dated July 7, 2022

   - **EXHIBIT D**: Scheinman Award dated June 27, 2022

   - **EXHIBIT E**: Rreligious Exemption Appeal

   - **EXHIBIT F**: Espinosa Denial

   - **EXHIBIT G**: Barry Black Declaration

   - **EXHIBIT H**: Declaration of Betsy Combier dayed June 12, 2022 and email from **(updated)**      Eric Amato on the Problem Code

   - **EXHIBIT H(a):** Email from UFT Rep. Karen King re Problem Code 1/20/22

- **EXHIBIT H(b):** NY State Department of Labor on Benefits Denial as "misconduct" February – April 2022

- **EXHIBIT I**: DOH Mandate dated Sept. 15, 2021

- **EXHIBIT J**: Scheinman Award September 10, 2021

- **EXHIBIT K**: Court of Appeals Order Kane/Keil Cases November 28, 2021

- **EXHIBIT  L:** PERB U-32479  Dated June 13, 2022

- **EXHIBIT M:** Abadi Order in Kambouris v NYC Dep't of Educ., 1/30/2022

- **EXHIBIT N:** UFT-DOE Memorandum of Agreement March 20, 2020


Dated: March 6, 2024

**_/s/Maria Ruscelli_**
Maria Ruscelli

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
─────────────────────────────────x

**MARIA RUSCELLI**,

Plaintiff                                                    **Docket No: 23-CV-07475**

-against-

**THE DEPARTMENT OF EDUCATION**
**OF THE CITY OF NEW YORK,**

Defendants
─────────────────────────────────x

# PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**MARIA RUSCELLI**
**2550 INDEPENDENCE AVENUE,**
**APT 3M**
**BRONX, NEW YORK 10463**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT      2

STANDARD OF REVIEW      10

POINT I: PLAINTIFF HAS PLED SUFFICIENT FACTS TO SUPPORT      10
HER CLAIM OF DISCRIMINATION PURSUANT TO TITLE VII, FREE EXERCISE
CLAUSE, NYSHRL AND NYCHRL

POINT II: PLAINTIFF HAS SUFFICIENTLY PLED CHRL DISCRIMINATION AND DEFENDANT'S      21
FAILURE TO ACCOMMODATE TO STATE A CLAIM

POINT III: PLAINTIFF'S COMPLAINT HAS SUFFICIENTLY PLED 42 U.S.C. §1983,      24
FOURTEENTH AMENDMENT AND EDUCATION LAW §§3020 AND 3020-A TO
SURVIVE DISMISSAL

POINT IV: PLAINTIFF HAS ADEQUATELY PLED A STIGMA PLUS CLAIM      28
AND FRAUD IN THE INDUCEMENT

CONCLUSION      29

# PRELIMINARY STATEMENT

Plaintiff MARIA RUSCELLI ("Plaintiff") submits the arguments below, and **Exhibits I-M**

**(**to be added to **Exhibits A-H(b)** in compliance with FCRP Rule 12(b)(6))  in opposition to

the  DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK's (henceforth

"Defendant") Motion To Dismiss her Complaint. This Motion must be denied, for all the

reasons set forth below.

Plaintiff has pled a *prima facie* case with facts and supporting evidence showing that

Defendant used a series of discriminatory, temporary Executive Orders and the COVID

Vaccine Mandate ("CVM"; Mandate ended February 8, 2023) to subsume permanent

Federal rights such as tenure, due process, religious, human and property in such a way as

to make these rights null and void for Plaintiff in the fall of 2021 and obtain her removal

from her job. Defendant used subterfuge, secret documents and deals with Arbitrators,

and the United Federation of Teachers ("UFT; see **EXHIBIT N** attached) to fraudulently mislead excellent tenured employees such as Plaintiff to the inevitable end of their employment. All Appeals were pre-set to fail.

Defendant never looked to employee rights as a Guide, and throughout, showed disdain for anyone with Tenure.

New York courts have consistently found that when public employers have any discretion to terminate or change a public worker's employment, the employee is entitled to procedural due process. Plaintiff, a tenured employee of the NYC Department of Education (NYC DOE), has a constitutionally protected property and liberty interest in her continued employment. See Cleveland Bd. of Educ. v Loudermill, 470 U.S. 532, 538 (1985). This interest is created and defined by independent sources such as state law and contract. See Bd.of Regents v. Roth, 408 U.S. 564, 577 (1972); Catterson v. Caso, 472 F. Supp. 833, 838 (E.D.N.Y. 1979) and Federal Laws such as the First, Fourth, Fifth, and 14th Amendments to the Constitution.

 In Carnley v. Cochran, 369 U. S. 506 (1962), the Court held "[p]resuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less is not waiver." Id., at 516. Additionally, a waiver of a teacher's tenure rights must be knowingly and freely given. Matter of Gould v. Bd. of Educ. of the Sewanhaka CHSD, et al., 184 A.D.2d 640, 584 N.Y.S.2d 910 (N.Y. App. Div.1992); Matter of Abramovich v. Bd. of Educ. of the Three Villages CSD No. 1, 46 NY2d 450. Tenured teachers have a property and liberty right to their jobs, and therefore when there is any penalty that reduces the benefits of these rights, there must be Just Cause. Plaintiff never waived her right to a 3020-a before she was terminated.

In New York, those interests are protected by a panoply of both statutory and contractual due process procedures applicable to employees serving in various titles and at various points in their careers. For Plaintiff, a tenured employee, her protected rights are also public policy of New York State. These procedures have been found to satisfy constitutional due process requirements. See e.g., Montefusco v. Nassau County, 39 F. Supp. 2d 231, 239-40 (E.D.N.Y. 1999) (Educ. Law § 3020-a); Matter of Marsh v. Hanley, 50 A.D.2d 687, 688 (3d Dep't 1975) (Civil Service Law § 75).

Indeed, Defendant even trashed Education Law §3020, where the foundations of the charging procedure for teachers in Sections 1 and 2 is clearly explained and  cannot be waived by fiat nor by bargaining unit:

"the provisions of section 3020, which state that "[n]o person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in  accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement." N.Y. Educ. Law § 3020(1) and,

"(iii) the provisions of subdivisions one and two of this section shall not apply to agreements negotiated pursuant to this subdivision"
(https://www.nysenate.gov/legislation/laws/EDN/3020);

See Education Law 3020 (3)(iii):

Also, Appeal of Principal Forrest, Decision 15,482, NYSED Commissioner's Decisions.

(and Complaint, pp. 13-16).

The procedures used by Defendant – the appeals - were unconstitutional and served only to support the deliberate and malicious intent of Defendant to punish Plaintiff for her religious beliefs under the guise of "compelling New York City public school employer's interests", which does not – or should not – impede or burden the Free Exercise Clause and Equal Rights under Federal law…but did just that.

Defendant's Motion To Dismiss ("Motion") did not give this Court any evidence that

Plaintiff's causes of action were false or insufficiently pled and therefore the Motion must be denied in it's entirety. The Motion also gave no sufficiently pled reason or excuse for not giving Plaintiff chance to have a dialogue with a member of the Department designated to oversee insubordination charges, which is why she was placed on the Problem Code on October 4, 2021.

Had Plaintiff been given a chance to speak in front of a neutral arbitrator or judge who was not under Martin Scheinman's authority (**EXHIBIT F**) where she had 10 minutes to say what her religious beliefs were, she could have presented a case in which she could have made the statement that she had never had any disciplinary action against her during her career, and there was no legitimate non-discriminatory reason for her to be terminated, charged, taken off salary, or suspended. (**EXHIBIT F**) Plaintiff should have been given a 3020-a, which is mandatory for tenured educators before any reduction or loss of salary. See:

"The key to a successful defense against a complaint of discrimination is documentation which proves the legitimate non-discriminatory reasons for the actions taken against the employee." Celeste Segure, "Defending Human Rights", On the Legal Side, Spring 2000. **The "Gotcha Squad" and the New York City Rubber Rooms**, NYC Rubber Room Reporter, March 15 2009.
LINK: https://nycrubberroomreporter.blogspot.com/2009/03/gotcha-squad-and-new-york-city-rubber.html

Defendant presented no such non-discriminatory reason for the Defendant's actions described herein, and therefore the Motion must be denied.

Plaintiff commenced this Section 1983 action alleging that Defendant wrongfully terminated her without engaging in proper Constitutional and protected due process procedures mandated by her tenured status. The City of New York created intentionally false reasons to deny religious accommodations by re-directing Plaintiff's efforts towards obtaining an "exemption" – not covered by TITLE VII, only "accommodation" – in order

to circumvent her legal rights. The procedures used to obtain the religious "exemption", specifically the Appeals Arbitrations opened up by Martin Scheinman's Impact Bargaining Award (**Exhibit J**, attached) as well as the Citywide Panel which followed the demise of SAMS decisions as "constitutionally unsound" created by the Defendant to hear religious "exemption" appeals, were clearly unconstitutional in their strategies to hear the appellants in a meaningful manner (See Complaint, **Exhibit C**, Scher letter, as well as Masciarelli v New York City Department of Education, NYED Exhibit C. Eichenholtz Deposition).

The deception of Defendants during the pandemic to get Plaintiff and thousands of other employees fired is wide-spread and pre-planned. Consider the months taken for Plaintiff to request and appeal her religious exemption, only to fail in the end. State and federal law require the provision of reasonable religious accommodations – not religious exemptions. In the event an employee made reference to, asked a question, or attempted to submit a religious accommodation, Defendant surreptitiously responded with information concerning religious *exemptions* and ignored any reference made to religious accommodations. Scheinman wrote in his September 10 Award **(Ex. J)** only about religious exemptions and medical exemptions or accommodations. He never mentioned "religious accommodations".

The purpose of Defendant's "sleight-of hand" was to deceive its employees into believing the terms "accommodation" and "exemption" were analogous despite knowing a religious "exemption" and a religious "accommodation" are not analogous but rather, legally distinct terms. Plaintiffs could not in good faith or conscience receive a medical product that they knew had been tested, produced, developed, or derived through the use of aborted fetal cell line tissues procured from aborted fetuses. That was the information

Plaintiff had at the time. (See **EXHIBIT E**).

In response, Defendant did not contest the validity of Plaintiffs' asserted religious beliefs or that her beliefs were sincerely held; rather, Defendant refused to provide Plaintiff with a religious exemption because they knew "religious exemption" is not mentioned in TITLE VII.

Simultaneously, the Defendant secretly placed a problem code on Plaintiff's personnel file, so that she could not work for any school or agency that had any financial connection with the Defendant, and as a result permanently convicted her of misconduct for holding religious beliefs which prohibited her from getting the COVID vaccine. Plaintiff was informed about this problem code in February 8, 2022 during a zoom meeting with more than 100 teachers and teacher advocates. The secret placement of the problem Code on Plaintiff's fingerprints and personnel file on October 4, 2021 made her guilty of misconduct and insubordination for her not getting the COVID vaccine due to her religious beliefs. The publication of the email sent to the UFT by Eric Amato (**EX. H,** updated) at the U.S. Court of Appeals created a storm of outrage because it changed the narrative presented by Martin Scheinman and showed the Defendant was disciplining/punishing Plaintiff and other unvaccinated employees for their religious beliefs.

Plaintiff's subsequent termination was the direct result of the unconscionable discrimination, unconstitutional strategies, and targeted retaliatory actions used by Defendant against Plaintiff to unfairly, wrongfully, and permanently terminate her for not getting vaccinated with the COVID shot under the COVID Vaccine Mandate (CVM) without due process of law. See **EXHIBIT I**, DOH Order.

Contrary to what the Defendant states in the Motion, Plaintiff's claims pursuant to 42

U.S.C. §1983, Fourteenth Amendment and Education Law §3020 and 3020a are not similarly pled in any other case. Plaintiff's other case that was dismissed in this Court did not have the Problem Code as a stated claim, and did not argue the protections guaranteed to a charged employee under Education Law §§3020 and 3020-a in sufficient particularity as to make a valid claim. In her Complaint, Plaintiff does this by detailing the §3020-a procedures trashed by Defendant to reach their goal of terminating her no matter what rule, memo or Law conflicted with their strategy or targeted conclusion. There is no *res judicata* for the stated claims in her Complaint here. See **EXHIBITS H,** and **N.**

Plaintiff argues that the submission here of the Problem Code changes everything, and makes her case different from any other case filed on behalf of teachers terminated for their religious beliefs. Plaintiff's Complaint states clearly – without simply making conclusions - that the processes used by Defendant to try to convince this Court of the alleged neutrality and non-disciplinary nature of the denials of religious exemptions are bogus, fraudulent and deceitful. In **EXHIBIT N,** the secret, unratified and unconstitutional Memorandum of Agreement arranged by the Defendant to satisfy the need for moving the UFT out of the way so they could not impede Defendant's trashing of Plaintiff's rights, shows bad faith and fraud in the inducement.

In the 2020 MOA the NYC DOE and UFT agreed to change the terms of employment and UFT-DOE contract (CBA) in any way that supported the Department's arbitrary and random alleged 'compelling need to keep the children safe in the public school system'. See **EXHIBIT N**). This MOA was never ratified or shared with DOE employees. That the Defendant knew the science behind the COVID vaccine protecting everyone was insufficient at that time was irrelevant. **EXHIBIT I.** Further, the NYCDOE failed to set

forth any statutory bases that might establish the authority of the NYCDOH Commissioner to impose a new qualification or even a condition of employment on the employees of the NYCDOE without compliance with N.Y. Education Law § 2573.9. or the Taylor Law. To make matters worse, the language of the NYCDOH Commissioner's Order does not state that a vaccine is a condition of employment or a new qualification to be employed by the NYCDOE. The Order is silent as to these issues. "A showing of bad faith requires a showing of fraudulent, deceitful, or dishonest action." White v. White Rose Food, 237 F. 3d 174 at 179 (2nd Cir. 2001)(internal quotation marks omitted.) See also, Moore v. Roadway Express, Inc., 07-cv-977, 2008 U.S. Dist. LEXIS 64886 at *11 (E.D.N.Y. 2008). Plaintiff respectfully requests that as the September 10, 2021 Impact Bargaining Award listed in her Complaint as Exhibit B was accidentally omitted, this Court accept its' re-submission here as **EXHIBIT J**. Plaintiff requests that the September 10 Scheinman Award is incorporated here in full, and incorporates her Complaint as well as all **Exhibits A-H** by reference.

Defendant's Motion To Dismiss is a thinly-veiled attempt to reframe Plaintiff's case into something that it is not and redirect this Court's attention from the egregious and unscrupulous actions and behaviors of the Defendant. In a confusing presentation of misguided and misstated facts, Defendant's papers ignore the four corners of Plaintiff's Complaint and disregard the facts in the detailed factual allegations which are to be accepted as true.

Plaintiff seeks monetary and declaratory relief against Defendant for her wrongful termination, for committing acts with the intent and for the purpose of depriving Plaintiff of property and liberty rights without the procedural due process guaranteed under the Free Exercise Clause, 5th and 14th Amendments, and for refusing to or neglecting to

prevent such deprivations and denials to Plaintiff. (FRCP 8(a)(2)). Also argued below Plaintiff seeks injunctive relief and punitive damages for the Defendant's deliberate discrimination against her solely because of her religious beliefs. The subterfuge by the Defendant was widespread, with the goal of terminating all Plaintiff and all unvaccinated employees without giving anyone – or a token few - exemptions for religious beliefs. (See Eichenholtz Deposition filed in this Court, Exhibit C, Masciarelli v New York City Department of Education 23-cv-7553).

Plaintiff has completed all of her administrative remedies, including filing a PERB charge of Improper Practice against the UFT on January 10, 2022, Exceptions to PERB Dismissal of her allegations on April 17, 2023, Notice of Claim and EEOC Discrimination Charge. Her Right To Sue letter was emailed to her on July 7, 2023, and this case was timely filed on Oct. 5, 2023. Plaintiff incorporates all documents submitted to this Court previously as submitted here in full by reference, including background facts.

In sum, the Defendant has not made a compelling argument to grant the Motion To Dismiss, and Plaintiff requests that the Motion be denied.

## STANDARD OF REVIEW

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a pleading must. contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss brought pursuant to Rule 12(b)(6), the pleadings must contain enough facts to state a claim to relief that is plausible on its face." Dellatte v. Great Neck Union Free Sch. Dist., No. 10-cv-4348, 2012 WL 164078, at *1 (2d Cir. Jan. 20, 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). The court must accept] all factual allegations in the

complaint and draw] all reasonable inferences in the plaintiff's favor." Ruotolo v. City of

New York, 514 F.3d 184, 188 (2d Cir. 2008).

## POINT I

### PLAINTIFF HAS PLED SUFFICIENT FACTS TO SUPPORT HER CLAIM OF DISCRIMINATION PURSUANT TO TITLE VII, FREE EXERCISE CLAUSE, NYSHRL AND NYCHRL

Plaintiff has suffered irreparable, devastating loss of income and good standing after the

Defendant used the unconstitutional Scheinman Award dated September 10 2021 (Ex. J) and

the unsupportable decisions of the Citywide Panel to discriminate against her for her religious

beliefs. Then, Defendant used Plaintiff's improperly denied religious exemption requests to

terminate her from her job without due process. The most egregious comments throughout

Defendant's Motion are those which in effect claim: "Plaintiff pleads no facts to suggest that

she was terminated because of her Christian Faith. She was terminated because she declined

the COVID-19 vaccine, which was required of all DOE employees. The Vaccine Mandates

were equally applicable to everyone working with the DOE, excluding only those with valid

religious or medical exemptions…Even though Plaintiff may believe her religious exemption

denials were related in some way to her Christian faith, in actuality no pleaded facts point in

that direction (Motion, p. 7)….Here, Plaintiff's claims similarly read as "bald assertions"

(Motion, p. 8.).

To describe these comments as just untrue would do a disservice to any believers in the DOE

who still value the work they do for the children in New York City, yet every day have seen

how little value the Department gives to their employees' faith, no matter what it is, Christian

or otherwise. This comment comes from Masciarelli v NYC DOE, NYED 22-cv-7553: "The

Defendant has a well-documented history of religious intolerance towards employees who

sought a religious accommodation for the COVID-19 Vaccine Mandate. (Ex. I) and The

Plaintiff did not stand a chance of receiving a reasonable accommodation based on her

religion in violation of Title VII and the Free Exercise Clause of the First Amendment."

*Masciarelli*, Opposition To The Defendant's Motion To Dismiss, p.1.

To the Defendant, anyone who has a strong faith against taking the vaccine is making it up,

and he/she must be fired. The Defendant stands for intolerance, control, autocratic

government. The DOE stands for opposition to freedom of religion or freedom of anything.

There is no valid religious belief that should prohibit anyone from getting the COVID shot

and therefore anyone who claims such a thing is lying. Thus, the Problem Code was placed on

every employee's personnel file when he/she did not submit a valid COVID vaccine card.

This individual was permanently scarred by this flag, and could never again get a job at the

DOE or for any vendors (**EX.E,G, H, I, K**) No one can say this punishment was equal to the

crime – believing that her sincere religious beliefs conflicted with taking the COVID

vaccine).

There is discrimination in the LWOP policy put into place by Scheinman Sept. 10, namely the

discriminatory inference in the Scheinman Award against unvaccinated members including

Plaintiff. On Pg 12 of the arbitration agreement, it states that unvaccinated employees who are

granted exemptions will be assigned to work outside of a school building. On Pg 13 of the

arbitration agreement, it states that employees with granted exemptions need to submit to

Covid testing twice a week. Unvaccinated staff are being discriminated against by the DOE

because vaccinated individuals may also get infected and spread the virus. The Defendant has

failed to remove discriminatory testing or quarantine requirements such as testing

unvaccinated employees or testing unvaccinated employees with granted exemptions twice a

week. (See Arbitration Agreement Pg 13).

In the Motion To Dismiss ("Motion") the Defendant writes: ""In order to establish a prima facie Title VII claim, the Plaintiff must show that she: (1) is a member of a protected class; (2) was qualified for her position and satisfactorily performed her duties; (3) suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of discrimination." (Motion, p. 6). Also on p. 6 is the following: ""To satisfy the fourth prong, the plaintiff must allege facts 'sufficiently to plausibly suggest [a defendant's] discriminatory state of mind' and 'conclusory allegations are not entitled to the presumption of truth. To survive a motion to dismiss, the complaint must plead 'enough facts to state a claim to relief that is plausible on its face. '".

Defendant agreed that Plaintiff has pled a *prima facie* case on the first three prongs but not the fourth. (p. 7). In fact, Defendant wrote : "However, SHRL religious discrimination claims are subject to the same standards as her § 1983 Title V II claims, and should be dismissed for the same reason, failure to adequately allege that her termination was motivated by her religious beliefs."

 Defendant could not be more wrong. Plaintiff has submitted facts to show that she was terminated solely because of her religious beliefs. Plaintiff, a stellar teacher without any disciplinary action against her in her teaching career, was suddenly put on a Leave Without Pay (LWOP), her fingerprints were flagged by a Problem Code, she was forbidden to get unemployment benefits due to her "misconduct" (her religious beliefs) and blocked from ever getting a job with the Defendant due to the Stigma now attached to her file, solely because of her religious beliefs. See **Exhibits B, C, E, F, H, Ha and Hb**.

Plaintiff argues that she has pled facts sufficient to prove *more* than an inference of

discrimination against her employer, the Defendant, and she does not rely on simple conclusions. It's a fact that Scheinman's September 10 Award discriminated against Department employees who applied for religious exemptions, but held out on discriminating against a select few:

"Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists)"(EX. J, p. 9)

This action shows invidious discriminatory animus within a disciplinary policy put forth by the Defendant as valid under the law. This is what the Defendant argues in this Court, but fails to substantiate.

Plaintiff does not belong to the Christian Scientist faith, and her religious beliefs are personal. She did not fit into the Scheinman criteria for getting a religious exemption (she was misled by the semantics used by Scheinman, and thought religious exemption was the same as religious accommodation). Clearly the criteria prescribed by the Award is discriminatory, and Scheinman and Defendant showed intent in creating this Award and the Appeals procedure. It was all subterfuge.

We know that making categories of religious beliefs as seen only serves those who fit into the small number of people allowed to have an exemption. The arbitrators who decided the first step Appeals of the religious exemption ("RE") requests worked at Scheinman Arbitration and Mediation Services ("SAMS"), whose Director and Founder is none other than Martin Scheinman. His employees, the arbitrators, allowed no one to get an exemption. The SAMS appeal procedure was set up to deny everyone. Indeed, Plaintiff was told by her UFT

Representative before her virtual hearing with SAMS arbitrator Sarah Espinosa, to tell Ms. Espinosa about her "personal religious beliefs" (see Motion, p. 4; **Exhibit E**) and she had 10 minutes.

Plaintiff was denied and her pleas for exemption were never heard because the procedures Defendant set up made it impossible. The Defendant wanted Plaintiff fired, period. Additionally, termination of employees who filed appeals for religious exemptions to the COVID Vaccine is a drastic, draconian step to take for a temporary order such as CVM. Plaintiff received a denial with a little "X" in the box next to the word.(**Ex. F**) Fortunately Scheinman was 'caught' and the SAMS process was discarded by the United States Court of Appeals for the Second Circuit. The Justices ordered a new panel to follow Title VII. See **Exhibit K**, Court of Appeals Order.

The new procedure, however, was no better than the SAMS panel process. No information whatsoever was sent out to appellants to the Citywide Panel. No one knew who was on this Panel or what criteria they used, until the Deposition of Eric Eisonholtz was posted in this Court, *New Yorkers for Religious Liberty, Inc*., et al. v. *The City of New York*, et al., Eastern District of New York, Docket Number 2022-cv-00752. Allegedly about 80% of 100 appeals for religious exemptions were granted out of 3,200 or more applications. See also Eric Eichenholtz' deposition, Masciarelli v New York City Department of Education, Plaintiff's Memorandum of Law in Opposition To Motion To Dismiss, 22-cv-7553, p, 2 and Ex. C.

Before and after the submission of her religious exemption request to the Citywide Panel, Plaintiff was not allowed to speak in front of any member of the Panel, and never knew who made the decisions or why her Appeal was denied by "them/him/her, whomever". This is most certainly discriminatory, and bad faith. Plaintiff was discriminated against because her

religious beliefs would not permit her to get vaccinated with the COVID vaccine.

The panic and hatred the Defendant marketed about those employees who were not vaccinated was harsh, demeaning, and discriminatory. Many people saw similarities with the AIDS epidemic in the 1980's, when anyone with AIDS was fired and ostracized. No one was allowed to work who had this disease.

Title VII of the Civil Rights Act of 1964 addresses religious freedom. The act prohibits employers from discriminating against its employees because of their sincerely held religious beliefs. Title 42 U.S.C section 2000e-2(a).

The Supreme Court case the *EEOC v. Abercrombie & Fitch Stores, Inc*. 575 U.S. 768 (2015) concluded that "An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions. Title VII contains no knowledge requirement. Furthermore, Title VII's definition of religion clearly indicates that failure-to-accommodate challenges can be brought as disparate-treatment claims. And Title VII gives favored treatment to religious practices, rather than demanding that religious practices be treated no worse than other practices. Id., 575 (slip opinion pages 2–7) .

Title VII defines "religion" as "all aspects of religious observance and practice, as well as belief." Moreover, as the EEOC has made clear, Title VII's protections also extend nonreligious beliefs if related to morality, ultimate ideas about life, purpose, and death. See EEOC, Questions and Answers: Religious Discrimination in the Workplace (June 7, 2008), Questions and Answers: Religious Discrimination in the Workplace | U.S. Equal Employment Opportunity Commission (eeoc.gov) ("Title VII's protections also extend to those who are discriminated against or need accommodation because they profess no religious beliefs . . . . Religious beliefs include theistic beliefs, for example, those that include a belief in God as

well as non-theistic 'moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.' Although courts generally resolve doubts about particular beliefs in favor of finding that they are religious, beliefs are not protected merely because they are strongly held. Rather, religion typically concerns 'ultimate ideas' about 'life, purpose, and death'").

Also, the First Amendment to the Constitution protects Plaintiff's free exercise of religion and mandates state accommodation for members of religious groups who object to the vaccinations on religious grounds. The Free Exercise Clause recognizes and guarantees Americans the ''right to believe and profess whatever religious doctrine [they] desire.'' *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990). The Free Exercise Clause also ascertains that government may not attempt to regulate religious beliefs, compel religious beliefs, or punish religious beliefs. *Sherbert v. Verner*, 374 U.S. 398, 402 (1963); *Torcaso v. Watkins*, 367 U.S. 488, 492–93, 495 (1961); and *United States v. Ballard*, 322 U.S. 78, 86 (1944).

Government may not discriminate against or impose special burdens upon individuals because of their religious beliefs or status. Plaintiff argues that the "criteria" mystery (i.e. details as to what the criteria are) of the SAMS Panel and the Citywide Panel show animus and discrimination against the unvaccinated Plaintiff because anything could be used against her. Government may not punish or otherwise harass religious adherents for speaking on religious topics or sharing their religious beliefs. *Widmar v. Vincent, 454 U.S. 263, 269 (1981);* and the U.S. Const., amend. I, cl. 3. The Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government. Employment Division, 402.; West Virginia State Bd. of Educ. v. Barnette,

319 U.S. 624, 642 (1943). The Free Exercise Clause protects beliefs rooted in religion, even if such beliefs are not mandated by a particular religious organization or shared among adherents of a particular religious tradition. Frazee v. Illinois Dept. of Employment Security, 489 U.S. 829, 833–34 (1989). As the Supreme Court has repeatedly counseled, ''religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'' Church of the Lukumi Babalu Aye v. Hialeah, 508 U.S. 520, 531 (1993) They must merely be ''sincerely held.'' Frazee, 834. Importantly, the protections guaranteed by the Free Exercise Clause also extend to acts undertaken in accordance with such sincerely held beliefs. That conclusion flows from the plain text of the First Amendment, which guarantees the freedom to ''exercise'' religion, not just the freedom to ''believe'' in religion. *Employment Div. v. Smith, 494 U.S. 877 (1990); Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 716 (1990); McDaniel v. Paty, 435 U.S. 627 (1978; Sherbert v. Verner, 374 U.S. 403–04 (1963);* and *Wisconsin v. Yoder,* 406 U.S. 205, 219–20 (1972).

The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Lyng vs Northwest Indian Cemetery Protective Association , 485 U. S., 439 (1988)*. ''It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.'' (*Sherbert v. Verner*, 374 U.S. 404 (1963). Because a law cannot have as its official ''object or purpose . . . the suppression of religion or religious conduct,'' a law must ensure that it is actually neutral and of general applicability. Church, 533-534.

A law is not neutral if it singles out particular religious conduct for adverse treatment, treats the same conduct as lawful when undertaken for secular reasons but unlawful when

undertaken for religious reasons, applies uncalled for restrictions on religious conduct''; or ''accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices.'' Id. 538; Church, 537.

A law is not generally applicable if ''in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief,'' Id 543., including by ''fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does'' the prohibited conduct, id., or enables, expressly or de facto, ''a system of individualized exemptions,'' as discussed in, Department of Human Resources of Oregon v. Smith, 494 U.S. 884 (1990); see Church, 537; ''Neutrality and general applicability are interrelated, . . .[and] failure to satisfy one requirement is a likely indication that the other has not been satisfied.'' Id, 531.

For example, a law that disqualifies a religious person or organization from a right to compete for a public benefit—including a grant or contract—because of the person's religious character is neither neutral nor generally applicable. See Trinity Lutheran Church of Columbia, Inc. v. Comer, Director, Missouri Department of Natural Resources, 582 U.S. (slip opinion pages 9–11) (2017).

Nonetheless, the requirements of neutral and general applicability are separate, and any law burdening religious practice that fails one or both must be subjected to strict scrutiny, Church, 546. [O]nly in rare cases'' will a law survive this level of scrutiny. Id 546.

Of course, even when a law is neutral and generally applicable, government may run afoul of the Free Exercise Clause if it interprets or applies the law in a manner that discriminates against religious observance and practice. The Free Exercise Clause, much like the Free Speech Clause, requires equal treatment of religious adherents. *Trinity Lutheran Church of*

*Columbia, Inc. v. Comer 582 U.S.* (slip opinion. Page 6) (2017); see also *Good News Club v. Milford Central Sch., 533 U.S. 98, 114* (2001), and *Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 837, 841* (1995)).

As Defendant's Motion relies on discriminatory, unsupportable, secret and improper procedures to terminate Plaintiff, the Motion must be denied and Plaintiff returned to her employment with backpay and benefits.

## POINT II

### PLAINTIFF HAS SUFFICIENTLY PLED CHRL DISCRIMINATION AND DEFENDANT'S FAILURE TO ACCOMMODATE TO STATE A CLAIM

Title VII requires that employers "reasonably accommodate the religious practices of an employee or prospective employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business." TITLE VII, 42 U.S.C. 2000e *et seq.* 29 CFR Part 1605 - PART 1605, §1605.2- Reasonable accommodation without undue hardship as required by section 701(j) of title VII of the Civil Rights Act of 1964:

"The legal principles which have been developed with respect to discrimination prohibited by title VII on the bases of race, color, sex, and national origin also apply to religious discrimination in all circumstances other than where an accommodation is required.

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977) held that an employer was not required to provide an employee with the Sabbath off because "[t]o require [the employer] to bear more than a de minimis cost in order to give [the employee] Saturdays off is an undue hardship." *Baker v. The Home Depot, 445 F.3d 541* (2d Cir. 2006) held that "Pursuant to the NYC Administrative Code, the City of New York must reasonably accommodate an employee who's sincerely held religious belief, practice, or observance conflicts with a work requirement, unless the accommodation would create an **undue hardship** or present a direct threat." *See NYC Admin. Code* 8-107(3) .

Moreover, "the determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, *in a cooperative dialogue." See NYC Admin. Code* 8-107 (28)(e) Finally, agency personnel who do not interact in a cooperative dialogue and then make decisions that do not accommodate the employee, fail to comply with statutory authority.

An employer who contends that it cannot reasonably accommodate a religious observance or practice must establish undue hardship on its business with specificity; it cannot rely on assumptions about hardships that might result from an accommodation. Here, Defendant never gave Plaintiff any details of why her religious exemptions and accommodation were denied, nor was there ever a cooperative dialogue.

See also NYS Executive Law, Human Rights Law, Article 15, Section 296.

The denial of "reasonable" accommodations may be little more than cover for discrimination against a particular religious belief or religion in general and is counter to the general determination of Congress that the United States is best served by the participation of religious adherents in society, not their withdrawal from it. Protections for religious individuals in employment are the most obvious example of Congress's instruction that religious observance and practice be reasonably accommodated, not marginalized. (Title VII of the Civil Rights Act of 1964; Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 71–72 (1977)).

On June 29, 2023in the case *Groff v. DeJoy* 143 S. Ct. 2279, 2281 (2023) the U.S. Supreme Court disavowed the "more than a *de minimis cost*" phrase holding that such a showing does not establish "undue hardship" under TITLE VII. So what does "undue hardship" mean under

Title VII? Rather than adopting the standard used for ADA cases outright, the court noted that it is to be case specific while still leaving the door open to its particulars. "We think it is enough to say that an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." The Supreme Court turned to the text of the statute to note that "hardship" is "something hard to bear," while the modifier "undue" means that the adversity is "excessive" or "unjustifiable." At a minimum, an undue hardship is something greater than hardship. Ultimately, courts will have to evaluate the possible accommodation's effect on "the conduct of the employer's business" and ask if it is too much to bear. 42 U.S.C. § 2000e(j). Of course, an employer cannot deny a religious accommodation due to its own opposition to religious practice – that is, the concept of accommodating a religion cannot in and of itself be "undue." Now, employers must be prepared to consider religious accommodations requests on a case-by-case basis and look at its own size, the costs, and other factors, to determine whether such requests are reasonable or an undue burden.

The Groff v DeJoy decision puts the meaningless conclusion of Defendant, "two words – "undue burden" – into a category necessitating strict scrutiny, something that Defendant did not ever want to do (as can be seen from their actions since October 2021 and before). Employees with religious objections to vaccine mandates have stronger legal claims now that the US Supreme Court has developed a new standard strengthening protections for workplace religious accommodations. The new standard gives Plaintiff a stronger argument that seeking an exemption from vaccine policies on religious grounds is a reasonable accommodation, and it puts on the Defendant a higher burden to show what the actual cost to their business is when granting an accommodation or giving a request any consideration. ("Vax Mandate Suits Get

Lift From New Religious Accommodation Test", Khorri Atkinson, Bloomberg News, July 3, 2023.)

At no time did the Defendant explain what the undue burden was when Plaintiff's appeals were denied. Therefore, on this fact, the Motion should be denied with or without Groff v DeJoy. But certainly the Court should agree with the failure of the Department to give a single fact in support of the burden they had to give Plaintiff and others similarly situated some kind of accommodation from getting the COVID vaccine because of their religious beliefs. There were none in the Motion, and the Motion must be denied.

### POINT III

### PLAINTIFF'S COMPLAINT HAS SUFFICIENTLY PLED 42 U.S.C. §1983, FOURTEENTH AMENDMENT AND EDUCATION LAW §§3020 AND 3020-A TO SURVIVE DISMISSAL

The Defendant uses the made-up "New York City public school employer's compelling interests" to argue they have the right to use a temporary CVM to get rid of thousands of stellar employees permanently. This absurd proposition is combined with the disturbing omission of any facts to support Defendant's claims in their Motion that the arguments and statements Plaintiff makes here are the same as those made in her prior case. Any one with a few seconds to read can see that new information about each of these issues are, and have been above, presented as new and different. There is no *res judicata* here.

Education Law §§3020 and 3020-a shine a light on compelling *state* interests, which cannot be undone by City interests. And, the compelling City interests only concern a small percentage of the population.

The Broecker case (*Broecker v New York Dep't of Education*, 585 F. Supp.3d 299; E.D.N.Y., 2022) never pled the Problem Code.

*Ricca v. Board of Educ*, 47 N.Y.2d 385 (N.Y. 1979):

"[I]t is a legislative expression of a firm public policy determination that the interests of the public in the education of our youth can best be served by a system designed to foster academic freedom in our schools and to protect competent teachers from the abuses they might be subjected to if they could be dismissed at the whim of their supervisors. In order to effectuate these convergent purposes, it is necessary to construe the tenure system broadly in favor of the teacher, and to strictly police procedures which might result in the corruption of that system by manipulation of the requirements for tenure. This is not to suggest that the school board in this instance acted with bad faith or from any improper motive. Even "good faith" violations of the tenure system must be forbidden, lest the entire edifice crumble from the cumulative effect of numerous well-intentioned exceptions."

Also, while the Defendant uses the "New York City public school employer's compelling interests" to argue they have the right to use a temporary CVM to get rid of thousands of stellar employees permanently, this Court should remain mindful of Education Law §§3020 and 3020-a that is public policy, state law and mandated due process pursuant to the Tenure Law of New York State. New York City is the only place in the State where the CVM was mandatory. How does a temporary city interest trash permanent compelling state interests in keeping teachers in their jobs for the children?

These procedures lacked statutory authority and were promoted by Defendant to obtain pre-determined outcomes of termination without probable cause. This is malicious prosecution and discrimination because Plaintiff had religious beliefs that the Defendant did not want to consider, and therefore just didn't, and set up procedures that prohibited any meaningful input from Plaintiff. Most certainly the Defendant did not want to defend their City interests in any forum, not even a 3020-a arbitration.

Defendant's Motion To Dismiss is a thinly-veiled attempt to reframe Plaintiff's case into something that it is not and redirect this Court's attention from the egregious and unscrupulous actions and behaviors of the Defendant toward the Plaintiff's allegedly insufficient pleading of any facts to support her claims. Defendant's papers ignore the four

corners of Plaintiff's Complaint and disregard the facts in the detailed factual allegations which are to be accepted as true.

The Defendant deliberately and knowingly violated public policy under color of law in order to terminate Plaintiff without honoring her Constitutional rights to be heard.

Additionally, N.Y. Municipal Home Rule Section 11(1)(c) states as follows:

"No local legislative body is empowered to enact laws or regulations which supersede state statutes, particularly with regard to the maintenance, support, or administration of the educational system."

In the *Matter of Stephen Rosenblum, v New York City Conflicts of Interest Board et al.*, 75 A.D.3d 426; 903 N.Y.S.2d 228; 2010 N.Y. App. Div. LEXIS 5749; 2010 NY Slip Op 5875, the First Department Appellate Division held that the New York State Supreme Court ruling was correct, that "the exclusive avenue to discipline a tenured pedagogue is Education Law § 3020-a "(see Education Law § 3020).

The statutory procedures for due process were completely disregarded in this case and Plaintiff's tenure rights were not protected. See: *Matter of Schumer v. Holtzman*, 60 N.Y. 2d 46, 51. Finally, when interpreting a statute, "our primary consideration is to discern and give effect to the Legislature's intention" (*Matter of Albany Law School v. New York State Office. of Mental Retardation & Dev. Disabilities,* 19 N.Y.3d 106, 120, 945 N.Y.S.2d 613, 968 N.E.2d 967 [2012]). The text of a statute is the "clearest indicator" of such legislative intent and "courts should construe unambiguous language to give effect to its plain meaning" (*Matter of DaimlerChrysler Corp. v. Spitzer,* 7 N.Y.3d 653, 660, 827 N.Y.S.2d 88, 860 N.E.2d 705 [2006]). We have also previously instructed that "[i]t is an accepted rule that all parts of a statute are intended to be given effect and that a statutory construction which renders one part meaningless should be avoided" ( *Rocovich v. Consolidated Edison Co.*, 78

N.Y.2d 509, 515, 577 N.Y.S.2d 219, 583 N.E.2d 932 [1991]). Furthermore, "a statute ... must

be construed as a whole and ... its various sections must be considered together and with

reference to each other" (*Matter of New York County Lawyers' Assn. v. Bloomberg, 19 N.Y.3d 712, 721, 955 N.Y.S.2d 835, 979 N.E.2d 1162* [2012] ).

As held in *Matter of City of New York* (228 N.Y. 140, 152, 126 N.E. 809 [1920]) which

involved New York City's right to alienate piers and wharves held in the public trust, "[w]hen

there is a fair, reasonable and substantial doubt concerning the existence of an alleged power

in a municipality, the power should be denied"

## POINT IV

## PLAINTIFF HAS ADEQUATELY PLED  A STIGMA PLUS CLAIM AND FRAUD IN THE INDUCEMENT

Defendant committed fraud on the employees who applied for religious exemptions starting in

2020, when the Defendant made a secret deal with the UFT to change the terms of

employment as well as the articles in the contract (CBA) for employees without these issues

ever being brought to any employee, including Plaintiff. Defendant then gave, reluctantly,

false hope to more than 1000 employees as they were told they could apply for religious

exemptions from first the Scheinman SAMS Arbitrators, and then the Citywide Panel. Both

Panels were bogus in terms of state and Federal Law. Denials were pre-set.

See discussion on pp. 3, 8 about EXHIBIT N, the MOA dated March 20, 2020.

Whiler Defendant insists that Plaintiff "does not state with particularity the circumstances

constituting fraud", (Motion p. 19), Plaintiff begs to differ. Exhibit N has a date – March 20,

2020 – and the creation of the SAMS and Citywide Panel as well as the Plaintiff's termination

were the direct result of the fraudulent acts cited in the MOA.

Additionally, Scheinman's September 10 2021 Award was a fraud because he wrote that LWOP, the wholesale, unilateral suspension on October 4, 2021 of tenured and untenured educators who could not/did not/would not get the COVID vaccine, was "not" disciplinary, but it most certainly was disciplinary because of the very secret placement of all unvaccinated employees onto the problem code. **EXHIBIT J, H –updated**, **H(a)** Karen King's email to members, and **EXHIBIT H(b)** the Department of Labor denial of benefits due to "misconduct (the Problem Code). Furthermore, Defendant is deliberately incorrect about the Problem Code not being available to future employers. (Motion, p. 18) It most certainly is. See:

**The New York City Department of Education's "Problem Code" is an Unlawful Flag on an Employee's Fingerprints,** Parentadvocates.org,
https://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=8884

**In NYC the Absent Teacher Reserve and The Rubber Room Are Both Strategies For Unlawful Denial of Tenure Job Protections**
https://www.parentadvocates.org/index.cfm?fuseaction=article&articleID=8958

**The Problem Code, Fingerprints, The FBI, and the COVID Mandate**
NYC Rubber Room Reporter, February 12, 2023
https://nycrubberroomreporter.blogspot.com/2023/02/the-problem-code-and-covid-mandate.html

Not only is the "misconduct" label given to Plaintiff false, but this 'scarlet letter' is available to future employers because an employer may call the Defendant when trying to hire a person, only to find out that they cannot pay the person as the Department's Galaxy database (the budget/payroll) is blocked.

See also **EXHIBIT G, H-updated.** There is the Stigma Plus. And the fraud in the inducement, created by Martin Scheinman to fire unvaccinated tenured employees of the Defendant without due process 3020-a arbitration.

## CONCLUSION

In order to successfully allege a claim for a substantive due process violation, it must be

alleged that the government action being challenged was "arbitrary, conscience shocking, or oppressive in a constitutional sense. Substantive due process mandates that Defendant not protect government action that is incorrect or ill-advised. While there is no clear standard for what actions are deemed conscience shocking, it has been held that it stems from actions that are "malicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience. Such acts by their very nature offend our fundamental democratic notions of fair play, ordered liberty and human decency." *Johnson v. Newburgh Enlarged Sch. Dist*., 239 F.3d 246, 251-52 (2d Cir. 2001), citing *City of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998), *Breithaupt v. Abram*, 352 U.S. 432,435 (1957).

The claims contained within the four corners of Plaintiff's Complaint go straight to the heart of a substantive due process claim. The very idea that a person's livelihood through tenure, which is supposed to be determined through a fair evaluation of an educator's job performance, is denied in open and blatant retaliation for requesting an accommodation – i.e. a "rubber room" or home assignment during the pandemic after not getting the COVID vaccine - is outrageous and unconstitutional in the widest sense and shocks the conscience. The Department at any one time for the past 22 years has made large and small reassignment centers ("rubber rooms") as well as offices and home, available to keep employees who cannot be near children for any and all reasons. Educators spend anywhere from 2 months to 7-8 years in these rooms, every day, on full salary with benefits. The Department could have easily offered reassignment as a temporary reassignment for the unvaccinated.

 See the blog "NYC Rubber Room Reporter and ATR Connect"
                https://nycrubberroomreporter.blogspot.com

and,        "The "Gotcha Squad" and the New York City Rubber Rooms
https://nycrubberroomreporter.blogspot.com/2009/03/gotcha-squad-and-new-york-city-rubber.html

There is no reasonable interpretation of the actions by Defendant alleged within the Complaint that could or should be excused as negligence or mistake.

Plaintiff's termination was pre-planned and part of a strategy to deny state and Federal laws and rights. Even if such a definition is up for debate, it is inapplicable in a motion to dismiss stage and a simple reading of the Complaint amply demonstrates that conscience shocking behavior has been sufficiently alleged to permit this cause of action to continue through to discovery as a matter of law.

**WHEREFORE**, the Plaintiff demands judgment against the Defendant for all compensatory, emotional, psychological and punitive damages, and any other damages permitted by law pursuant to the above referenced causes of action. It is respectfully requested that this Court grant Plaintiff any other relief to which she is entitled, including but not limited to:

1. Awarding Plaintiff her tenured position and salary given to her before October 2021, in full, with benefits; and

2. Awarding Plaintiff all the backpay and financial damages that ensued after she was placed on a lawless and unconstitutional Leave Without Pay;

3. Granting such other and further relief that the Court seems just and proper.

Dated: March 6, 2024

/s/Maria Ruscelli
Maria Ruscelli, Plaintiff Pro Se



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
New York Direct Dial: (929) 506-5270
FAX (212) 336-3625
Website: www.eeoc.gov

**EMAIL DELIVERY**

*Maria Ruscelli*
*2550 Independence Ave., 3M*
*Spuyten Duyvil, New York 10463*
*Mariaruscelli@yahoo.com*

*Re. EEOC Charge: 520-2022-00320*

Dear Ms. Ruscelli:

The Equal Employment Opportunity Commission ("Commission") has concluded its inquiry/investigation into your allegations of discrimination contained in the above-referenced charge. Under Commission procedures, we focus our resources only on those charges that are most likely to result in findings of violations of the laws we enforce. In accordance with these procedures, the Commission has evaluated your charge based on the evidence provided.

You allege that the ___New York City Department of Education___ discriminated against you because of your religion in that it failed to provide an accommodation based on your sincere religious belief, all in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII).

Title VII requires an employer to provide a job accommodation to an individual with a sincerely held religious belief that would relieve employees of the burden of choosing between their jobs and their religious convictions. Under Title VII, however, the employer is not required to provide a requested accommodation if it would result in more than a minimal hardship to the employer. Courts have found more than a minimal hardship where the requested accommodation impairs workplace safety [e.g., spread of COVID -19], or cause co-workers to carry the accommodated employee's share of potentially hazardous or burdensome work. A requested accommodation that conflicts with another law would also be considered more than a minimal hardship for the employer. Under Title VII, the EEOC must also consider other factors including: the assessment of the public risk posed at a particular time; the availability of effective alternative means of infection control; and the number of employees who actually request accommodations.

Based upon the information submitted during the investigation, the Commission is unable to conclude that the evidence establishes a violation of Title VII. The Respondent has successfully illustrated that the granting of your requested accommodation would have been more than a minimal hardship under the circumstances. This does not certify that the Respondent is in compliance with statutes. No finding is made as to any other issue that might be construed as having been raised by this charge. The EEOC's processing of this charge has been concluded. Included with this letter is your Notice of Dismissal and Right to Sue. Following this dismissal, you may only pursue this matter by filing suit against the Respondent within ninety (90) days of

receipt of this notice.  Otherwise, your right to sue will be lost. If you have any questions, *please contact Investigator Glendora Young at (929) 506-5290.*

Sincerely,


*Glendora Young*                                          *7/7/2023*
EEOC Investigator                                          Date

## Reasonable Accommodation Appeal Determination

noreply@salesforce.com <noreply@salesforce.com>
on behalf of
NYC Employee Vaccine Appeals <vaxappeal@dcas.nyc.gov>
Mon 3/7/2022 3:57 PM

To: Ruscelli Maria <MRuscelli@schools.nyc.gov>

The City of New York Reasonable Accommodation Appeals Panel has carefully reviewed your Agency's determination, all of the documentation submitted to the agency and the additional information you submitted in connection with the appeal. Based on this review, the Appeals Panel has decided to deny your appeal. This determination represents the final decision with respect to your reasonable accommodation request.

The decision classification for your appeal is as follows: DOE has demonstrated that it would be an undue hardship to grant this accommodation to the employee given the need for a safe environment for in-person learning.

**For all employees other than DOE employees:** Pursuant to the City of New York's policy concerning the vaccine mandate, you now have **three business days** from the date of this notice to submit proof of vaccination. If you do not do so, you will be placed on a leave without pay (LWOP).

**For Department of Education (DOE) employees:** Pursuant to New York City Department of Education policy, you have seven calendar days to extend your Leave Without Pay or return to work. If you do neither, you will be subject to termination. For further information and instructions, please see DOE Denial of Appeal Information.

# THE SCHER LAW FIRM, LLP

ONE OLD COUNTRY ROAD, SUITE 385
CARLE PLACE, NY 11514

MARTIN H. SCHER*
JONATHAN L. SCHER**

AUSTIN R. GRAFF*

* Also Admitted in District of Columbia
· Also Admitted in New Jersey

TEL: 515-746-5040

FAX 516-746-5043

W. SCOTT KERSHAW
COUNSEL

MICHAEL SCHILLINGER
COUNSEL

ROLAND P. BRINT
COUNSEL

ADAM GANG
COUNSEL

ROBERT S. NAYBERG
(1050 2020)

July 7, 2022

**BY FEDERAL EXPRESS AIRBILL NO. 777327941330**
**AND BY ECF**
Honorable Kiyo A. Matsumoto, U.S.D.J.
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  Broecker, *et al.* v. New York City Department of Education, *et al.*
> Docket No. 21-CV-06387-KAM-LB

Dear Judge Matsumoto:

This law firm represents the Plaintiffs in the above-referenced Action.  The Plaintiffs request permission to supplement their opposition to the Motions to Dismiss based upon new documentary evidence obtained yesterday contained in the filing with the New York State Supreme Court, County of New York in a newly filed litigation entitled *In the Matter of the Application of the Board of Education of the City School District of the City of New York, et al. v. United Federation of Teachers, Local 2, AFT, AFL-CIO, et al.* under Index Number 451995/2022 ("DOE Proceeding"), regarding a dispute over a new arbitration decision by the Defendant Martin Scheinman ("Scheinman") materially and relevant to the pending Motions to Dismiss.

The *New York Post* reported yesterday on the DOE Proceeding which challenges Scheinman's Opinion and Award relating to 82 NYCDOE employees placed on leave without pay by the New York City Department of Education ("NYCDOE") for filing allegedly false vaccine cards.  *See*, **Exhibit A**, a copy of the *New York Post* article.

Through due diligence, we were able to find the NYCDOE's filings in the DOE Proceeding, which included the new Opinion and Award issued by Scheinman that directly relates to the pending Motions to Dismiss in the above-referenced Action.

# THE SCHER LAW FIRM, LLP

In Scheinman's newest Opinion and Award (**Exhibit B** ("Opinion and Award")), Scheinman states with respect to the UFT Arbitration Award ("Award"):

> ... While the Department claims its action is unconnected with the Award, it is the Award itself that created a new leave without pay. Absent the Award, the Department was without the authority to remove these employees from the payroll without providing a due process hearing.
>
> Leave without pay is an unusual outcome. Yet, I decided it was appropriate for employees whose requests for a medical or religious exemption were denied. This is because such employees intentionally decided to disregard the mandate they be vaccinated by September 27, 2021, the date established by Commissioner Chokshi and Mayor de Blasio.

**Exhibit B**, at page 10.

This language, written by Scheinman in the Opinion and Award supports three arguments previously made by the Plaintiffs in opposition to the Motions to Dismiss:

First, Scheinman's words establish that but-for the Award, the NYCDOE could not have placed the Plaintiffs on leave without pay. As Plaintiffs argued in opposition to the Defendants' Motions, the Award was a violation of N.Y. Civil Service Law § 209.3.(f) and the numerous cases that have interpreted the statute, including a case from the New York Court of Appeals and numerous opinions issued by PERB. Therefore, if the Court finds that the Award violated N.Y. Civil Service Law § 209.3.(f), as the Plaintiffs argue, then the NYCDOE did not have any authority to place the Plaintiffs on leave without pay without due process, thereby violating the Plaintiffs' due process rights. Scheinman's words are additional evidence that the Plaintiffs have stated a plausible claim against the NYCDOE for a violation of 42 U.S.C. § 1983 meaning the NYCDOE's Motion to Dismiss should be denied.

Second, it was Scheinman who "created a new leave without pay" by issuing the Award. Scheinman establishes, by his own words, that he actively participated in the violation of the Plaintiffs' due process rights by "creat[ing] a new leave without pay" policy. Scheinman was not acting like an arbitrator who interpreted a contract or acted like an umpire in a dispute between the NYCDOE and the United Federation of Teachers ("UFT"), but actively created new policy that, as Scheinman admits, but-for his Award, "the Department was without the authority to remove these employees from the payroll without providing a due process hearing." **Exhibit B**,

THE SCHER LAW FIRM, LLP

Honorable Kiyo A. Matsumoto, U.S.D.J.
United States District Court, Eastern District of New York
July 7, 2022
Page 3 of 3

at page 10. Scheinman's own words establish that the Plaintiffs have stated a plausible claim for a violation of 42 U.S.C. § 1983 against the NYCDOE and Scheinman because as he admits, without his Award, the NYCDOE would have had to provide the Plaintiffs with due process before placing them on leave without pay, admitting that his actions caused the Plaintiffs to "suffer[ ] a denial of [their] federal statutory rights, or [their] constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). Accordingly, the Scheinman Defendants' Motion to Dismiss must be denied.

Third, Scheinman confirms that it was him who "decided [leave without pay] was appropriate", which means that the NYCDOE and the UFT did not "continu[e] to negotiate until an 'agreement' [was] reached" but instead the resolution of the NYCDOE's and UFT's impasse was imposed by Scheinman in violation of N.Y. Civil Service Law § 209.3.(f). *Matter of Buffalo Teachers Federation v. City School District of the City of Buffalo*, 49 PERB P4560 (2016). Scheinman's words confirm that the Award was a newly created and imposed remedy to the school district's impasse in negotiations with its union and therefore violated clear and unambiguous statutory language requiring a school district, like the NYCDOE, and its union, like the UFT, to overcome any impasse at the bargaining table and not through any other means. As a result, Scheinman's words support the Plaintiffs' argument that they have a plausible claim that the Award was promulgated and instituted without any statutory authority.

*******************

The Plaintiffs thank the Court for its courtesies in accepting the Plaintiffs' supplemental filing, considering the Opinion and Award only came into the Plaintiffs' possession yesterday and the Plaintiffs believed, as shown above, that the Opinion and Award is material and relevant to the pending Motions to Dismiss.

Respectfully submitted,

THE SCHER LAW FIRM, LLP

Austin Graff

cc: Counsel of Record (by ECF)

H:\Martino, Michelle\Teacher Litigation\Motions\Motion # 002 - Motions to Dismiss\Opposition to the Motion\July 2022 Supplemental Letter\7-7-2022 letter to Court re Scheinman award.doc



**SCHEINMAN**
ARBITRATION & MEDIATION SERVICES

June 27, 2022

<u>**Via E-Mail Only**</u>
Liz Vladeck, Esq.
New York City Department of Education
Office of the General Counsel
52 Chambers Street, Room 308
New York, NY 10007

Alan M. Klinger, Esq.
Stroock & Stroock & Lavan, L.L.P.
180 Maiden Lane, 33rd Floor
New York, NY 10038

Michael Mulgrew, President
Beth Norton, Esq.
United Federation of Teachers
52 Broadway, 14th Floor
New York, NY 10004

Re:    **Board of Education of the City School District of the City of New York
       and
       United Federation of Teachers, Local 2, AFT, AFL-CIO
       (Proof of Vaccination)**

Dear Counsel:

    Enclosed please find my Opinion and Award in the above referenced matter.

    I have also enclosed my bill for services rendered.

    Thank you.

Sincerely,

*Martin F. Scheinman*

MFS/sk
NYCDOE.UFT.proof of vaccination.trans

322 Main Street ◆ Port Washington, NY 11050 ◆ 516.944.1700 ◆ fax: 516.944.1771 ◆ www.ScheinmanNeutrals.com

```
--------------------------------- X
In the Matter of the Arbitration
                                   X
         between
                                   X       Re: Proof of
BOARD OF EDUCATION OF THE CITY                 Vaccination
SCHOOL DISTRICT OF THE CITY OF     X
NEW YORK
                                   X
         "Department"
                                   X
         -and-
                                   X
UNITED FEDERATION OF TEACHERS,
LOCAL 2, AFT, AFL-CIO              X

         "Union"                   X

--------------------------------- X
```

**APPEARANCES**

> **For the Department**
>   Liz Vladeck, General Counsel
>
>
> **For the Union**
>   STROOCK & STROOCK & LAVAN, L.L.P.
>     Alan M. Klinger, Esq.
>
>     Beth Norton, Esq., UFT General Counsel
>     Michael Mulgrew, UFT President

**BEFORE:**  Martin F. Scheinman, Esq., Arbitrator

# BACKGROUND

The Union protests the Department's decision to summarily place approximately eighty two (82) Department employees on leave without pay, with benefits, effective April 25, 2022. This action was based upon information the Department received from a separate investigative agency these employees' proof of COVID-19 vaccination was allegedly fraudulent. The Union contends the issue of whether the Department's action is proper and falls within the scope of my September 10, 2021, Award ("Award").

Most of the basic facts are not in dispute.

In July 2021, former Mayor de Blasio announced a "Vaccine-or-Test" mandate which required the City workforce, including the educators, to either be vaccinated or undergo weekly testing for the Covid-19 virus effective September 13, 2021. Thereafter, on August 23, 2021, Mayor de Blasio and the New York City Commissioner of Health and Mental Hygiene, David A. Chokshi, MD, announced a new policy for those workforces in Department buildings. Those employees would be subject to a "Vaccine Only" mandate. That is, such employees would need to show by September 27, 2021, they had at least started the vaccination protocol or would not be allowed onto Department premises, would not be paid for work and would be at risk of loss of job and benefits.

This mandate was reflected in an Order of Commissioner Chokshi, dated August 24, 2021. That Order, by its terms, did not expressly provide for exceptions or accommodations for those with medical contraindications to vaccination or sincerely-held religious objections to inoculation. Nor did it address matters of due process with regard to job and benefits protection.

The Union promptly sought to bargain the impact and implementation of the Vaccine Only mandate. The parties had a number of discussions, but important matters remained unresolved.

On September 1, 2021, the UFT filed a Declaration of Impasse with the Public Employment Relations Board ("PERB") as to material matters. The Department did not challenge the statement of impasse and PERB appointed me to mediate the matters. Mediation sessions were held immediately on September 2, 3, 4 and 5, 2021, with some days having multiple sessions. Progress was made, and certain tentative understandings were reached, but significant matters remained unresolved. By agreement of the parties, the process moved to arbitration. They asked I serve as arbitrator.

Arbitration sessions were then held. On September 10, 2021, I issued an Award which set forth a detailed procedure to be followed in the cases of employees who sought an exemption to the Vaccination Mandate based on a medical condition or religious reasons.

3

In accordance with the procedure set forth in my Award, employee requests for an exemption were initially submitted to the Department along with any supporting documentation. An employee wishing to appeal an adverse determination by the Department was given the opportunity to appear at a hearing before an impartial arbitrator who was authorized to render a final and binding decision. Approximately five hundred (500) appeals were determined by the arbitration process. Pending the arbitrator's decision, the employee could not be removed from the payroll.

On April 19, 2022, the Department informed approximately eight two (82) employees they were being placed on leave without pay, with benefits, effective April 25, 2022, based on allegations their proof of COVID-19 vaccination was fraudulent. The employees were told they could contact the Department if they believed the allegation they submitted fraudulent proof of vaccination was wrong. On April 21, 2022, the Union wrote the Department and demanded it rescind its decision to remove these employees from the payroll without the benefit of a due process hearing.

By letter dated April 22, 2022, the Department set forth its position placement of these employees on a leave without pay status did not constitute discipline, and, therefore, did not implicate the disciplinary procedures set forth in the Education Law or the parties' Collective Bargaining Agreement ("Agreement").

4

Thereafter, by letter dated May 3, 2022, the Union wrote to me requesting I take jurisdiction over this dispute. The Union cited to that portion of the Award which states "should either party have reason to believe the process set forth herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution".

By letter dated May 4, 2022, the Department wrote in opposition to the Union's May 3, 2022, letter. The Department stated it was in full compliance with my Award, as well as the Agreement and applicable law. The Department also insisted this matter was not properly before me.

On May 4, 2022, I conducted a conference call with the parties. At that time, each side was given the opportunity to argue their positions.

Thereafter, on May 6, 2022, the Union submitted further argument in support of its position. The Department responded in a letter dated May 10, 2022.

Upon my receipt of the parties' written submissions, I closed the record.

## DISCUSSION AND FINDINGS

### The Issues:

The basic issues to be decided are as follows:

1. Is the Department's decision to place the approximately eighty two (82) employees on leave without pay, with benefits, subject to my jurisdiction pursuant to the September 10, 2021, Award?

2. If so, what shall be the remedy?

## Position of the Parties

The Department insists the facts of circumstances regarding its placement of the eighty two (82) employees on leave without pay, with benefits, is not within my jurisdiction pursuant to the Award. According to the Department, the Award sets forth an expedited process to review Department employees' requests for exemptions and accommodations from the August 21, 2021, mandate to submit proof of COVID-19 vaccination by September 29, 2021. The Department maintains the requests for an exemption or accommodation were limited to medical and religious grounds. It contends no other issue is covered by the Award.

The Department contends it placed the employees on a leave without pay status as a result of the Department's receipt of information from a law enforcement agency the employees in question submitted fraudulent proof of vaccination in order to comply with Commissioner Chokshi's order which required vaccination of all Department staff.

According to the Department, the Courts have held compliance with the Commissioner Chokshi's Order is a "condition of

employment". The Department maintains this situation is no different to the Department's unilateral action against an employee who is not certified. As such, the Department maintains placing employees on leave without pay for failing to comply with the Commissioner Chokshi's Order comports with applicable due process procedures as long as notice is given, and the employee has an opportunity to respond. In support of its position the Department cites Broecker v. N.Y. Dep't of Educ., 21-CV-6387, 2022 WL 426113 at *7-8 (E.D.N.Y. Feb. 11, 2022); and N.Y. City Mun. Labor Comm. V. City of New York, 151169/2022 (Sup. Ct. N.Y. County Apr. 21, 2022).

The Department argues employees who are identified in connection with a law enforcement investigation into the submission of fraudulent vaccination cards are outside the scope of the Award. Furthermore, the Department insists the Award's reference to a party's failure to implement the process does not apply to the facts and circumstances presented, here. According to the Department, the language relied upon by the Union refers specifically to the "administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school". The Department asserts since that process is not at issue, here, the Union's claim is misplaced.

For the reasons set forth above, the Department contends the Union's request for relief pursuant to the Award must be denied.

The Union, on the other hand, argues the Department's decision to place these employees on leave without pay, with benefits, is predicated on the Award. It insists this matter is subject to my continued jurisdiction. The Union asserts the Agreement prohibits an employee from being removed from the payroll without establishing probable cause in a due process hearing. [1]

The Union maintains the Department's contention this situation is akin to the removal of an uncertified employee is misplaced. According to the Union, approval of certification is issued by the State. In addition, the Union insists an employee is either certified by the State or is not, there is no underlying question of fact to be determined. The Union asserts if an employee proves they have completed all of the necessary paperwork, but they are not yet certified, they will not be terminated.

The Union urges in this instance the Department made a unilateral decision to place the employees on leave, without pay, based solely on a communication from another agency the employees were not vaccinated. The Union contends the Department has no direct knowledge of whether that assertion is true or false.

---

[1] There are limited exceptions to this procedure which are inapposite.

According to the Union, the Department removed the employees from the payroll and subsequently allowed them to provide additional evidence they are vaccinated. The Union maintains as of May 6, 2022, employees who have contacted the Department asserting they have been placed on leave without pay in error have not received any response, yet they remain suspended without pay.

The Union asserts the only authority for the Department to place employees on leave without pay, with benefits, is the Award. It contends the Department is improperly invoking the Award, and the action cannot be taken until the dispute concerning their vaccination status is determined through the Award's stated process.

In short, the Union argues the Department's unilateral decision to place employees on leave without pay, with benefits, based on the communication from another agency the employees are not vaccinated falls within the jurisdiction of the Award.

## Opinion

Certain preliminary comments are appropriate. As an arbitrator my role is a limited one. In order for me to determine whether I can assert jurisdiction over the Department's actions as alleged by the Union, I am limited by the language of the Award. If the Award is clear, I must enforce it according to its plain meaning.

With these principles in mind, I turn to the facts presented.

I find I have jurisdiction to consider this matter. While the Department claims its action is unconnected with the Award, it is the Award itself that created a new leave without pay. Absent the Award, the Department was without the authority to remove these employees from the payroll without providing a due process hearing.

Leave without pay is an unusual outcome. Yet, I decided it was appropriate for employees whose requests for a medical or religious exemption were denied. This is because such employees intentionally decided to disregard the mandate they be vaccinated by September 27, 2021, the date established by Commissioner Chokshi and Mayor de Blasio.

Implicit in such a designation of leave without pay is the individual failed to comply with the vaccine mandate. Here, there is a dispute whether the employees did or did not comply. Without that being assessed, or at least submitting evidence to show a high likelihood of non-compliance, the predicate for placing an employee on leave without pay does not exist.

The Department's decision to automatically place these employees on leave without pay is inconsistent with the language and underpinnings of my Award. Nothing in the Award grants the Department such use of leave without pay status.

Based upon the above, I find the Department failed to properly implement the due process protections of my Award. The Union has the right to assert the Department's process "is not implemented in good faith." To be clear, nothing in my Award was intended to abrogate any due process rights the parties otherwise maintained with regard to employment status.

I also disagree with the Department's position the court decisions it cites support the removal of these employees from pay status without a hearing. Those court decisions confronted an entirely different factual scenario. Unlike this matter, in those cited cases, there was no claim the employees at issue were vaccinated.

In denying the request for a preliminary injunction, Justice Kim, in NYC Municipal Labor Committee, supra., specifically found the absence of that factual issue in her determination. Here, of course, the employees assert they are in fact vaccinated. This raises a factual issue that is ripe for adjudication pursuant to my Award.

Based on the reasons set forth above, I take jurisdiction over the Department's placement of the approximately eighty two (82) employees placed on leave without pay, with benefits. The parties shall meet within seven (7) calendar days of the date of this Award to attempt to agree on a procedure to review an

11

employee's claim they have submitted proof of vaccination. If the parties are unable to agree on such a procedure, I shall immediately schedule a hearing and issue an expedited Award establishing the proper protocol to provide the employees the appropriate due process procedure.

**AWARD**

1.  Pursuant to Section 1L of my Award dated September 10, 2021, I shall assume jurisdiction over the Department's decision to place eighty two (82) employees on leave without pay, with benefits, effective April 25, 2022.

2.  The parties shall meet within seven (7) calendar days of the date of this Award to attempt to agree on a procedure to review an employee's claim they have submitted proof of vaccination. If the parties are unable to agree on such a procedure, I shall immediately schedule a hearing and issue an expedited Award establishing the proper protocol to provide the employees the appropriate due process procedure.

June 27 , 2022.

_____
Martin F. Scheinman, Esq.
Arbitrator


STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NASSAU     )

I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

June 27 , 2022.

_____
Martin F. Scheinman, Esq.
Arbitrator


DOE.UFT.CHIARA.NAKASHIAN.AWD

13

<u>**RELIGIOUS EXEMPTION REQUEST LETTER Submitted September 19, 2021**</u>

To whom it may concern,

It is my hope, as a result of what is presented here, that I will be granted a Religious Exemption from vaccination because it violates my deeply held religious and philosophical beliefs and related practices as well as personal autonomy and bodily integrity.

The New York City Mayor, Bill de Blasio, announced on August 23rd, 2021 a mandatory vaccination (Covid-19) for all Department of Education Teachers before September 27th 2021, as a requirement for continuing employment.

The August 23rd executive order deeply violates my sincere religious belief, which negatively impacts my moral and ethical vision of the world. As a Christian believer this mandate violates my sincerely held religious and innately held beliefs as well as my right to individual autonomy and bodily integrity.

Since Mayor de Blasio publicized the mandating vaccine, I have experienced a permanent state of stress, anxiety, lack of sleep and emotional distress as a result of the conflict that impacts my beliefs as well as the challenges that I may face for being at risk of losing my livelihood, health insurance, and the joy of being able to continue my profession.

❖ **RELIGIOUS & CULTURAL BELIEFS**

I sincerely and innately hold religious beliefs and practices that will be violated, if I am forced to receive the vaccine. They include the nature and basis of how my beliefs conflict with the vaccination. It is my belief that I am fearfully and wonderfully made by God who is the author and giver of life who made each person in his image and likeness desiring his

children to not only conform to the image of his Son Jesus which is done only through his Holy Spirit and his sinless blood, but to endorse life-giving behaviors and principles that leave a person with a clear conscience.

I am not satisfied nor do we have evidence that proper short and long-term tests and trials have been conducted to ensure that the vaccine is 100% effective and safe for the short and long-term health of the persons receiving the vaccine.

I also believe that I am entitled to self-preservation and protect my body from any harmful substance or jab that is still in a trial stage.

I believe in medication and that the purpose of medication is to bring health, life, and well-being mentally, emotionally, and physically. For this reason, my faith does not support the forced usage of medications that are not resolving the problem or for overindulgent and abusive reasons which cause more problems. Nor do I support the eating, drinking, or forced injection usage of blood into the body because blood is the transmitter of life and the carrier of disease and generational spiritual afflictions. It is also clearly forbidden by my faith (lev 17:10-11; gen 9:4; Lev 3:17; Acts 15:29).

In other words, I cannot in good conscience be forced to partake of or support **medicines manufactured by or tested on fetal cells and/or aborted babies** as it is equivalent to supporting murder. As murder is serious in the courtroom, it also negatively affects the human psyche and emotions. Endorsing the usage of blood can inflict negative physical, bring mental and emotional consequences, desensitize the conscience, and bring curses, and premature death (Gen 9:5-6). I support my petition for Religious Exemption base on the above citation from the Holy Bible.

**Scripture**

**Leviticus 17:10-12**

10 And whatsoever man there be of the house of Israel, or of the strangers that sojourn among you, that eateth any manner of blood; I will even set my face against that soul that eateth blood, and will cut him off from among his people. 11 For the life of the flesh is in the blood: and I have given it to you upon the altar to make an atonement for your souls: for it is the blood that maketh an atonement for the soul. 12 Therefore I said unto the children of Israel, No soul of you shall eat blood, neither shall any stranger that sojourneth among you eat blood.

**Leviticus 17:14**

For it is the life of all flesh; the blood of it is for the life thereof: therefore I said unto the children of Israel, Ye shall eat the blood of no manner of flesh: for the life of all flesh is the blood thereof: whosoever eateth it shall be cut off.

**Leviticus 19:26**

Ye shall not eat any thing with the blood: neither shall ye use enchantment, nor observe times

**Acts 15:29**

That ye abstain from meats offered to idols, and from blood, and from things strangled, and from fornication: from which if ye keep yourselves, ye shall do well. Fare ye well

**Genesis 9:4**

But flesh with the life thereof, which is the blood thereof, shall ye not eat

**Genesis 9:6**

Whoso sheddeth man's blood, by man shall his blood be shed: for in the image of God made he man.

**Genesis 42:22**

And Reuben answered them, saying, Spake I not unto you, saying, Do not sin against the child; and ye would not hear? therefore, behold, also his blood is required.

❖ **PERSONAL AUTONOMY AND BODILY INTEGRITY. FETAL COMPONENTS.**

The use of fetal tissue, fetal cells, or any product of abortion in the development or testing of a vaccine or any medical treatment is abhorrent to myself. I understand that the manufacturers of the COVID Vaccines have used aborted fetal cell lines as part of their development or testing of vaccines. I am firmly against of participating in or benefiting from an abortion, no matter how remote in time that abortion occurred.

According to the CDC, vaccines contain neurotoxins, hazardous substances, attenuated viruses, animal parts, foreign ADN, Albumin from human blood, carcinogens and chemical wastes that are proven harmful to the human body. Please see:

https://www.cdc.gov/vaccines/pubs/pinkbook/downloads/appendices/b/excipient-table-2.pdf

❖ **CONSTITUTIONAL RIGHTS**

I remarked that the Mayor's Executive order violates EEOC guidelines, Title VII of the federal Civil Rights Act (1964), and my civil rights as an American Citizen which are protected under the Constitution of the United States of America. Under Title VII of the Civil Rights Act of 1964, individuals have the right to be free from discrimination based on Religion.

Because receiving the COVID-19 vaccination would violate my sincerely held religious beliefs, I hereby request an accommodation of those beliefs with respect to the recently imposed vaccination requirement. Under Title VII of the federal civil rights laws, an employer may not discharge or otherwise discriminate against an individual because of the individual's religion. 42 U.S.C. § 2000e-2(a)(1). As the U.S. Supreme Court has held, this law requires an employer to seek to accommodate an employee whenever there is a conflict between a requirement of the employment and the employee's religious beliefs, practices or observances. Trans World Airlines, Inc. v. Hardison, 432 U.S. 63 (1977).

An accommodation that fully eliminates the conflict with my religious beliefs must be provided unless any and all accommodations would impose an undue hardship. To the extent, the law of the State of New York imposes a similar duty to accommodate the religious beliefs, practices or observances of employees;

I hereby invoke any and all rights under state law as well. Having formally notified the New York City Department of Education of the conflict between the COVID-19 vaccination requirement and my religious beliefs, I look forward to receiving in a prompt and timely manner your decision on what accommodation you will provide. Failing that, I reserve my right to pursue legal remedies available to me with the Equal Employment Opportunity Commission or otherwise in accordance with established law.

Sincerely yours,
Maria Ruscelli Ms. Ed.
NYC Bilingual Special Education teacher.
PS 17X

# Exhibit F

SCHEINMAN ARBITRATION AND MEDIATION SERVICES

---------------------------------------------- X

In the Matter of the Arbitration

                                     X

           between

                                     X

NEW YORK CITY DEPARTMENT OF EDUCATION         Re:UFT.687

                                     X

           and

                                     X

         Maria Ruscelli                      X

---------------------------------------------- X

Issue:     Religious Exemption

Date of Hearing: September 24, 2021

## Award

APPLICATION FOR EXEMPTION: GRANTED [ ]    DENIED [ x]    OTHER [ ]

The requirements necessary to establish a religious exemption were not met. Of note, the Pfizer and Moderna vaccines do not use fetal cell lines for vaccine production and manufacturing and do not contain any animal byproducts or preservatives.

*Sey M Eyer*

                                 September 24, 2021

_____         _____

**Arbitrator**                           **Date**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
                                           :

MICHAEL KANE, et al.,                     :
                                           :

                    Plaintiffs,       :
                                           :

           - against -            :   Case No.  21-cv-7863 (VEC) (Lead)
                                         :

BILL DE BLASIO, et al.,                 :
                                         :

                   Defendants.   :
-----------------------------------------------------------------X
                                         :

MATTHEW KEIL, et al.                 :
                                         :

                   Plaintiffs,       :
                                         :

          - against -           :   Case No.  21-cv-8773 (VEC)
                                         :

THE CITY OF NEW YORK, et al.,        :
                                         :

                   Defendants.   :
-----------------------------------------------------------------X

**DECLARATION OF BARRY BLACK IN FURTHER SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**BARRY BLACK**, an attorney admitted to practice before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

1.  I am an attorney for Plaintiffs and fully familiar with the facts and circumstances of this case.

2.  I respectfully submit this declaration in response to Mallory O. Sullivan's Declaration.

3.  Attached as Exhibit 1 is a true and correct copy of a declaration from Betsy Combier.

4.  Attached as Exhibit 2 is a true and correct copy of a declaration from Plaintiff Dennis Strk.

5.  Attached as Exhibit 3 is a true and correct copy of a declaration from proposed class member Patricia Catoire.

### First False Assertion in Sullivan Declaration

6.  The Sullivan Declaration asserts that there are two different kinds of codes in the NYCAPS system: a "problem code" and some other unnamed code, the "problem code" indicating anything from a performance issue to criminal activity, and the unspecified code flagging the absence of vaccination. Glaringly absent from Sullivan's recitation is how these codes appear to the reader. That is because there is no difference; they are one and the same.

7.  Indeed, DOE Human Resources Director Eric Amato explicitly stated in an email to UFT Assistant Secretary Michael Sill and General Counsel Beth Norton that a "[p]roblem code was added to all employees who were placed on 2VM vaccine mandate leave. Our central offices placed this code on all employees who went on the leave." Ex. 1, ¶ 13, Ex. A.

8.  Moreover, terminated Plaintiffs had a problem code plainly visible in their payroll portal, indicated by a "**Problem** PR" notation in their salary history tab. Ex. 2, ¶ 5, Ex. A; Ex. 1 ¶ 10 (DOE's "problem code" is also referred to as a "pr" code).

1

**<u>Second False Assertion in Sullivan Declaration</u>**

9.  The Sullivan Declaration falsely posits that the no one outside DOE's Office of Personnel Investigations has access to the problem code. To the contrary, any non-DOE school or official that wants to learn whether a former DOE employee has a problem code in his or her personnel file can easily do so in a variety of ways.  For example, non-DOE schools which offer DOE-funded positions have access to the DOE's payment portal, Galaxy, which allows them to see problem codes; indeed Plaintiffs present evidence of at least 15 former DOE employees who were not hired at non-DOE schools because the non-DOE schools discovered their problem codes. Ex. 1, ¶¶ 14-18.  Simple phone calls work as well: a former UFT Special Representative explained that she used to "receive[] countless calls every week asking . . . if there was a problem code on an employee's personnel file" and that her UFT colleague next door would then check her computer and "tell [her] 'yes' or 'no' within a minute." Ex. 1, ¶ 8.  In some instances, DOE representatives disclosed the problem codes to prospective employers from non-DOE schools calling to verify employment. Ex. 1, ¶ 19.  In one instance, a third-party HR representative at Bright Start Learning Center of NYC—a non-DOE school operating pursuant to NYS Department of Health Bureau of Early Intervention directives—informed a former DOE employee that she had had been flagged as "ineligible" in her personnel file. Ex. 3, ¶¶ 8-9, 13.

10. It is noteworthy that such evidence was already in the record before Defendants filed the Sullivan declaration, but Defendants did not even attempt to discredit it. ECF No. 162 ¶¶ 11-13 (Plaintiff Solon was told by an official at non-DOE school that it could not hire her because of the problem code in her personnel file).

2

**<u>Further Evidence of Irreparable Harm</u>**

11. Plaintiffs' irreparable harm did not cease with their terminations. Instead, the problem codes in their files make them unemployable indefinitely at both DOE and non-DOE schools.

12. The UFT has stated unequivocally that such problem codes "will be removed once [they] are eligible to return to work." Ex. 1, ¶ 13, Ex. A.

13. Thus, Plaintiffs face ongoing coercion to violate their religious beliefs and become vaccinated, in order to become employable – and remove the scarlet letter from their permanent records.

14. The Court is reminded that Plaintiff Solon's problem code was removed within 24 hours of her getting vaccinated. ECF No. 162 ¶ 18.

Dated: New York, New York

June 3, 2022

Respectfully submitted,

Barry Black
Nelson Madden Black LLP
*Attorney for Plaintiffs*
475 Park Avenue South, Suite 2800
New York, NY 10016
(212) 382-4303

3

# Exhibit H

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X :
                                                                  :
MICHAEL KANE, et al.,                                             :
                                                                  :
                                    Plaintiffs,                   :
                                                                  :   Case No.  21-cv-7863 (VEC) (Lead)
                  - against -                                     :
                                                                  :
DE BLASIO et al.,                                                 :
                                                                  :
                                    Defendants.                   :
-----------------------------------------------------------------X :
                                                                  :
MATTHEW KEIL, et al.                                              :
                                                                  :
                                    Plaintiffs,                   :
                                                                  :   Case No.  21-cv-8773 (VEC)
                  - against -                                     :
                                                                  :
THE CITY OF NEW YORK et al.,                                      :
                                                                  :
                                    Defendants.                   :
-----------------------------------------------------------------X

## DECLARATION OF BETSY COMBIER

Betsy Combier declares as follows, pursuant to 28 U.S.C. § 1746:

1.  My name is Betsy Combier and I am the President and lead paralegal of Advocatz, a
    paralegal consulting business for people who need a partner as they go through the
    Courts, grievances, or life problems.

2.  I respectfully submit this Declaration in support of Plaintiffs' Motion for a
    Preliminary Injunction.

3.  I know the facts stated herein to be true based upon my personal knowledge and
    based upon my review of the files of hundreds of my clients whom I have represented
    in proceedings with the New York City Department of Education ("DOE"), except

1

for statements which are made on information and belief and, as to those, I verily believe them.

4. I have a degree in Child Psychology from Northwestern University, an MA Certificate from the Johns Hopkins' School for Advanced International Studies where my specialization was the Soviet Military Industrial Complex, an MPS in Interactive Telecommunications from New York University, and a Certificate in Art and Drama Therapy from The New School.

5. I have successfully assisted parents, children, and caregivers with the educational needs of their children, and I have been advocating for the due process rights of Union members—in particular, members of the AFL-CIO, United Federation of Teachers ("UFT") and Local 32 B&J—for 17 years.

6. From 2007-2010, I worked as Special Representative to the UFT where my job was to oversee the eight re-assignment centers in the NYC DOE, first in all boroughs, and then at the Manhattan, Brooklyn, and Bronx locations.

7. I am very familiar with the arbitration hearing process, set forth in New York Education Law § 3020-a, having assisted teachers in approximately 300 3020-a hearings since 2003.

8. I am also very familiar with "problem codes"—the flag the DOE puts in the personnel file of employees to indicate that they should not be hired due to unexplained misconduct of some kind. Employees can be flagged for everything from receiving an unsatisfactory or ineffective rating to engaging in egregious criminal acts. During the three years I worked at the UFT headquarters, I received countless calls every week

2

asking me if there was a problem code on an employee's personnel file. When that happened, I would simply ask the person next door to my office, another UFT Special Representative, whether she could check her computer, and she would tell me "yes" or "no" within a minute.

9.      When the DOE puts a problem code in the employee's personnel file, it also places a flag on the employee's fingerprints, which is then sent to the national databases at both the Federal Bureau of Investigation and the State Division of Criminal Justice Services.

10.     I have represented more than 15 DOE employees before the DOE's Office of Personnel Investigation in proceedings in which they requested the removal of their problem codes. The flag has several names such as "problem code," "pr" code, "pc" code, "ineligible," and "no hire/inquiry" code; however, all refer to a salary block, whatever title it is given.

11.     I have helped approximately 20 DOE employees get their problem codes removed from their personnel files.

12.     I know of many former DOE employees who have problem codes in their personnel files because they declined to be vaccinated in violation of the DOE's mandate and were not granted a religious or medical exemption. The DOE places a problem code on the employee's personnel file immediately upon getting information that the employee did not submit proof of vaccination. As soon as the employee gets the vaccination and submits proof, the code is removed from his or her file.

3

13.     Attached as Exhibit A is a true and correct redacted copy of an email one of my clients received from Eric Amato at the DOE. The email was also sent to UFT Assistant Secretary Michael Sill and copies UFT officials including its General Counsel Beth Norton. The email confirms that DOE employees who were placed on leave without pay for failing to be vaccinated in violation of the DOE's mandate had a problem code (as opposed to any other kind of code) added to their personnel files.

14.     I am aware that non-DOE schools located in counties outside New York City receive funds from the NYC DOE for certain teaching positions. These may include, for example, special education or STEM teachers.

15.     The DOE pays the salaries for these positions using the same system it uses to pay traditional DOE employees, which is called Galaxy. Galaxy indicates whether the employee has a problem code in his or her file and blocks payment to the employee with this flag/code if viewed in the personnel file.

16.     Many of my clients with problem codes in Galaxy have looked for other teaching jobs outside the NYC DOE while their problem code appeals were ongoing.

17.     At least 15 of my clients with problem codes were not hired by prospective schools outside the DOE because such schools saw the problem codes in Galaxy, even though those schools were located outside New York City.

18.     Such schools were able to see the codes because the position applied for was financed by the DOE and so the school used the Galaxy system and could check the prospective employee's file.

4

19.   I also have several clients who applied to schools outside of the DOE who were not hired by their prospective employers because when the prospective employers reached out to the DOE to verify my clients' previous employment, the DOE representative told them about the problem codes in my clients' files.

20.   In sum, any non-DOE school that wants to learn whether a former DOE employee has a problem code in his or her personnel file can readily do so.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        June 3, 2022

_____
By: Betsy Combier

5

# EXHIBIT A

From: **Amato Eric** <EAmato4@schools.nyc.gov>
Date: Wed, Feb 9, 2022 at 8:06 AM
Subject: RE: PR code
To: ██████████████████████   Michael Sill <msill@uft.org>
Cc: Beth A. Norton
<bnorton@uft.org>, Kking@uft.org <Kking@uft.org>, dcampbell@uft.org <dcampbell@uft.org>

PR = Problem code — Problem code was added to all employees who were placed on 2VM vaccine mandate leave. It was placed there the day you went on the leave. Our central offices placed this code on all employees who went on the leave. It will be removed once you are eligible to return to work.


Thanks,
Eric

**To:** KKing@uft.org,
**Subject:** RE: Employee Code with the DOE
**Date:** Thu, Jan 20, 2022 11:05 am

Hello,

I hope that this email finds you well. The problem code is due to the vaccine mandate. Since you are unvaccinated then you are unable to work for the NYCDOE. In the future if this vaccine mandate was still in place and you were to get vaccinated you would be able to go back to the NYCDOE and the problem code would be removed.

**Karen King**
*Administrative Assistant to the Assistant Secretary &*
*Director of Personnel, Payroll, and Special Projects*
United Federation of Teachers
50 Broadway, 13th Floor
New York, N.Y. 10004
*kking@uft.org*

NYS DEPARTMENT OF LABOR
PO BOX 15131
ALBANY NY 12212-5131



**NEW YORK STATE DEPARTMENT OF LABOR**
**NOTICE OF DETERMINATION TO CLAIMANT**

DATE MAILED: 2/24/2022

EMP: THE CITY SCHOOL DIST

CHRISTINE A OREILLY

PLEASE REFER TO THOSE ITEMS WHICH ARE SELECTED ☒ BELOW AND READ THE BACK OF THIS FORM

1. ☒ NOTICE OF DETERMINATION

NO UNEMPLOYMENT INSURANCE BENEFITS WILL BE PAID TO YOU FOR THE PERIOD BEGINNING 10/02/2021 UNTIL YOU HAVE SUBSEQUENTLY WORKED FOR AN EMPLOYER AND EARNED AT LEAST 10 TIMES YOUR WEEKLY BENEFIT RATE. EMPLOYMENT AND EARNINGS FROM NON COVERED, EXCLUDED OR SELF-EMPLOYMENT WILL NOT COUNT. YOUR WEEKLY BENEFIT RATE IS $504.

**DETERMINATION**

YOU WERE DISCHARGED FOR MISCONDUCT IN CONNECTION WITH YOUR EMPLOYMENT WITH THE ABOVE EMPLOYER. BECAUSE OF THIS DETERMINATION, YOU WILL NOT BE ABLE TO USE YOUR WAGES FROM THIS EMPLOYER BEFORE 10/02/2021 TO COLLECT UNEMPLOYMENT INSURANCE BENEFITS IN THE FUTURE.

**REASON**

YOU WERE DISCHARGED ON 10/18/21 BECAUSE YOU REFUSED TO GET THE COVID 19 VACCINATION AS REQUIRED BY YOUR EMPLOYER PER THE DECEMBER 2021 NYC VACCINE MANDATE. YOUR EMPLOYER INFORMED YOU ON 9/23/21 THAT RECEIVING THIS VACCINATION WAS REQUIRED TO CONTINUE YOUR EMPLOYMENT, AND MANDATORY VACCINATIONS ARE PERMISSIBLE UNDER NYS LAW. YOU KNEW OR SHOULD HAVE KNOHN THAT YOUR ACTIONS WOULD JEOPARDIZE YOUR JOB.

2. ☐ NOTICE OF DETERMINATION OF WILFUL MISREPRESENTATION

**REASON**

☐ This notice supersedes the one sent you dated _____ which has been cancelled.

**TO PROTECT YOUR RIGHTS, READ THE BACK OF THIS FORM**

By: LABOR SERVICES REPRESENTATIVE
FOR THE COMMISSIONER OF LABOR

LO 412 (4-99)

CS Scanned with CamScanner
Scanned with CamScanner

NYS DEPARTMENT OF LABOR
PO BOX 15131
ALBANY NY 12212-5131

NEW YORK STATE DEPARTMENT OF LABOR
NOTICE OF DETERMINATION TO CLAIMANT

DATE MAILED: 4/29/2022

EMP: THE CITY SCHOOL DIST

HERENDYRA PEREYRA

PLEASE REFER TO THOSE ITEMS WHICH ARE SELECTED [X] BELOW AND READ THE BACK OF THIS FORM

1. [XX] NOTICE OF DETERMINATION

NO UNEMPLOYMENT INSURANCE BENEFITS WILL BE PAID TO YOU FOR THE PERIOD BEGIN-
NING 10/02/2021 UNTIL YOU HAVE SUBSEQUENTLY WORKED FOR AN EMPLOYER AND EARNED
AT LEAST 10 TIMES YOUR WEEKLY BENEFIT RATE.  EMPLOYMENT AND EARNINGS FROM NON
COVERED, EXCLUDED OR SELF-EMPLOYMENT WILL NOT COUNT.  YOUR WEEKLY BENEFIT RATE
IS $504.

DETERMINATION

YOU WERE DISCHARGED FOR MISCONDUCT IN CONNECTION WITH YOUR EMPLOYMENT WITH
THE ABOVE EMPLOYER.  BECAUSE OF THIS DETERMINATION, YOU WILL NOT BE ABLE TO
USE YOUR WAGES FROM THIS EMPLOYER BEFORE 10/02/2021 TO COLLECT UNEMPLOYMENT
INSURANCE BENEFITS IN THE FUTURE.

REASON

YOU WERE DISCHARGED ON 10/1/21 BECAUSE YOU REFUSED TO GET THE COVID
19 VACCINATION AS REQUIRED BY YOUR EMPLOYER.  YOUR EMPLOYER INFORMED YOU
BEFORE YOUR DISCHARGE THAT RECEIVING THE COVID 19 VACCINATION HAS REQUIRED TO
CONTINUE YOUR EMPLOYMENT, AND MANDATORY COVID 19 VACCINATIONS ARE PERMISSIBLE
UNDER NYS LAW.  YOU KNEW OR SHOULD HAVE KNOWN THAT YOUR ACTIONS WOULD
JEOPARDIZE YOUR JOB.

2. [ ] NOTICE OF DETERMINATION OF WILFUL MISREPRESENTATION

REASON

[ ] This notice supersedes the one sent you dated _____ which has been
cancelled.

TO PROTECT YOUR RIGHTS READ **THE BACK OF THIS FORM** _____   By: ___LABOR SERVICES REPRESENTATIVE___
FOR THE COMMISSIONER OF LABOR

NYS DEPARTMENT OF LABOR
PO BOX 15151
ALBANY NY 12212-5131

NEW YORK STATE DEPARTMENT OF LABOR
NOTICE OF DETERMINATION TO CLAIMANT
ALTERNATE DETERMINATION

DATE MAILED: 4/21/2022

EMP: THE CITY SCHOOL DIST

TONIANN MIRAGLIA

PLEASE REFER TO THOSE ITEMS WHICH ARE SELECTED [X] BELOW AND READ THE BACK OF THIS FORM

1. [XX] NOTICE OF DETERMINATION

NO UNEMPLOYMENT INSURANCE BENEFITS WILL BE PAID TO YOU FOR THE PERIOD BEGIN-
NING 10/02/2021 UNTIL YOU HAVE SUBSEQUENTLY WORKED FOR AN EMPLOYER AND EARNED
AT LEAST 10 TIMES YOUR WEEKLY BENEFIT RATE. EMPLOYMENT AND EARNINGS FROM NON
COVERED, EXCLUDED OR SELF-EMPLOYMENT WILL NOT COUNT. YOUR WEEKLY BENEFIT RATE
IS $415.

DETERMINATION

YOU WERE DISCHARGED FOR MISCONDUCT IN CONNECTION WITH YOUR EMPLOYMENT WITH
THE ABOVE EMPLOYER. BECAUSE OF THIS DETERMINATION, YOU WILL NOT BE ABLE TO
USE YOUR WAGES FROM THIS EMPLOYER BEFORE 10/02/2021 TO COLLECT UNEMPLOYMENT
INSURANCE BENEFITS IN THE FUTURE.

REASON

YOU WERE DISCHARGED BECAUSE ON 10/01/21 YOU REFUSED TO GET THE COVID
19 VACCINATION AS REQUIRED BY YOUR EMPLOYER. YOUR EMPLOYER INFORMED YOU IN
SEPTEMBER 2021 THAT RECEIVING THE COVID 19 VACCINATION WAS REQUIRED TO
CONTINUE YOUR EMPLOYMENT, AND MANDATORY COVID 19 VACCINATIONS ARE PERMISSIBLE
UNDER NYS LAW. YOU KNEW OR SHOULD HAVE KNOWN THAT YOUR ACTIONS WOULD
JEOPARDIZE YOUR JOB.

2. [ ] NOTICE OF DETERMINATION OF WILFUL MISREPRESENTATION

REASON

[ ] This notice supersedes the one sent you dated _____ which has been
cancelled.

TO PROTECT YOUR RIGHTS, READ THE BACK OF THIS FORM

By: LABOR SERVICES REPRESENTATIVE
FOR THE COMMISSIONER OF LABOR

LO 412 (4-99)

## ORDER OF THE COMMISSIONER
## OF HEALTH AND MENTAL HYGIENE
## TO REQUIRE COVID-19 VACCINATION FOR
## DEPARTMENT OF EDUCATION
## EMPLOYEES, CONTRACTORS, VISITORS, AND OTHERS

**WHEREAS**, on March 12, 2020, Mayor Bill de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City to address the threat posed by COVID-19 to the health and welfare of City residents, and such order remains in effect; and

**WHEREAS**, on March 25, 2020, the New York City Commissioner of Health and Mental Hygiene declared the existence of a public health emergency within the City to address the continuing threat posed by COVID-19 to the health and welfare of City residents, and such declaration and public health emergency continue to be in effect; and

**WHEREAS**, pursuant to Section 558 of the New York City Charter (the "Charter"), the Board of Health may embrace in the Health Code all matters and subjects to which the power and authority of the Department of Health and Mental Hygiene (the "Department") extends; and

**WHEREAS**, pursuant to Section 556 of the Charter and Section 3.01(c) of the Health Code, the Department is authorized to supervise the control of communicable diseases and conditions hazardous to life and health and take such actions as may be necessary to assure the maintenance of the protection of public health; and

**WHEREAS**, the U.S. Centers for Disease Control and Prevention ("CDC") reports that new variants of COVID-19, identified as "variants of concern" have emerged in the United States, and some of these new variants which currently account for the majority of COVID-19 cases sequenced in New York City, are more transmissible than earlier variants; and

**WHEREAS,** the CDC has stated that vaccination is an effective tool to prevent the spread of COVID-19 and benefits both vaccine recipients and those they come into contact with, including persons who for reasons of age, health, or other conditions cannot themselves be vaccinated; and

**WHEREAS,** the CDC has recommended that school teachers and staff be "vaccinated as soon as possible" because vaccination is "the most critical strategy to help schools safely resume full operations [and] is the leading public health prevention strategy to end the COVID-19 pandemic;" and

**WHEREAS,** on September 9, 2021, President Joseph Biden announced that staff who work in Head Start programs and in schools run by the Bureau of Indian Affairs and Department of Defense will be required to be vaccinated in order to implement the CDC's recommendations; and

**WHEREAS**, on August 26, 2021, New York State Department of Health adopted emergency regulations requiring staff of inpatient hospitals and nursing homes to receive the first dose of a vaccine by September 27, 2021, and staff of diagnostic and treatment centers, hospices, home care and adult care facilities to receive the first dose of a vaccine by October 7, 2021; and

**WHEREAS,** Section 17-104 of the Administrative Code of the City of New York directs the Department to adopt prompt and effective measures to prevent the communication of infectious diseases such as COVID-19, and in accordance with Section 17-109(b), the Department may adopt

vaccination measures to effectively prevent the spread of communicable diseases; and

**WHEREAS,** the City is committed to safe, in-person learning in all pre-school to grade 12 schools, following public health science; and

**WHEREAS** the New York City Department of Education ("DOE") serves approximately 1 million students across the City, including students in the communities that have been disproportionately affected by the COVID-19 pandemic and students who are too young to be eligible to be vaccinated; and

**WHEREAS**, a system of vaccination for individuals working in school settings, including DOE buildings and charter school buildings, will potentially save lives, protect public health, and promote public safety; and

**WHEREAS,** pursuant to Section 3.01(d) of the Health Code, I am authorized to issue orders and take actions that I deem necessary for the health and safety of the City and its residents when urgent public health action is necessary to protect the public health against an existing threat and a public health emergency has been declared pursuant to such section; and

**WHEREAS,** on August 24, 2021, I issued an order requiring COVID-19 vaccination for DOE employees, contractors, and others who work in-person in a DOE school setting or DOE building, which was amended on September 12, 2021; and

**WHEREAS**, unvaccinated visitors to public school settings could spread COVID-19 to students and such individuals are often present in public school settings and DOE buildings;

**NOW THEREFORE** I, Dave A. Chokshi, MD, MSc, Commissioner of Health and Mental Hygiene, finding that a public health emergency within New York City continues, and that it is necessary for the health and safety of the City and its residents, do hereby exercise the power of the Board of Health to prevent, mitigate, control and abate the current emergency, to

**RESCIND and RESTATE** my September 12, 2021 Order relating to COVID-19 vaccination for DOE employees, contractors, visitors, and others; and

I hereby order that:

1. No later than September 27, 2021, or prior to beginning employment, the following individuals must provide proof of vaccination as described below:
   a. DOE staff must provide proof of vaccination to the DOE.
   b. City employees who work in-person in a DOE school setting, DOE building, or charter school setting must provide proof of vaccination to their employer.
   c. Staff of contractors of DOE or the City, as defined below, must provide proof of vaccination to their employer, or if self-employed, to the DOE.
   d. Staff of any charter school serving students up to grade 12, and staff of contractors hired by charter schools co-located in a DOE school setting to work in person in a DOE school setting or DOE building, must provide proof of vaccination to their employer, or if self-employed, to the contracting charter school.

2. An employer to whom staff must submit proof of vaccination status, must securely maintain a record of such submission, either electronically or on paper, and must demonstrate proof of compliance with this Order, including making such records immediately available to the Department upon request.

3. Beginning September 13, 2021, all visitors to a DOE school building must show prior to entering the building that they have:
   a. Been fully vaccinated; or
   b. Received a single dose vaccine, or the second dose of a two-dose vaccine, even if two weeks have not passed since they received the dose; or
   c. Received the first dose of a two-dose vaccine.

4. Public meetings and hearings held in a DOE school building must offer individuals the opportunity to participate remotely in accordance with Part E of Chapter 417 of the Laws of 2021.

5. For the purposes of this Order:

   "Charter school setting" means a building or portion of building where a charter school provides instruction to students in pre-kindergarten through grade 12 that is not collocated in a DOE building.

   "DOE school setting" includes any indoor location where instruction is provided to DOE students in public school pre-kindergarten through grade 12, including but not limited to locations in DOE buildings, and including residences of students receiving home instruction and places where care for children is provided through DOE's LYFE program. DOE school settings include buildings where DOE and charter schools are co-located.

   "DOE staff" means (i) full or part-time employees of the DOE, and (ii) DOE interns (including student teachers) and volunteers.

   "Fully vaccinated" means at least two weeks have passed after an individual received a single dose of a COVID-19 vaccine that only requires one dose, or the second dose of a two-dose series of a COVID-19 vaccine approved or authorized for use by the Food and Drug Administration or World Health Organization.

   "Proof of vaccination" means proof that an individual:
   a. Has been fully vaccinated;
   b. Has received a single dose vaccine, or the second dose of a two-dose vaccine, even if two weeks have not passed since they received the dose; or
   c. Has received the first dose of a two-dose vaccine, in which case they must additionally provide proof that they have received the second dose of that vaccine within 45 days after receipt of the first dose.

   "Staff of contractors of DOE or the City" means a full or part-time employee, intern or volunteer of a contractor of DOE or another City agency who works in-person in a DOE school

setting, a DOE building, or a charter school, and includes individuals working as independent contractors.

"Visitor" means an individual, not otherwise covered by Paragraph 1 of this Order, who will be present in a DOE school building, except that "visitor" does not include:

   a. Students attending school or school-related activities in a DOE school setting;
   b. Parents or guardians of students who are conducting student registration or for other purposes identified by DOE as essential to student education and unable to be completed remotely;
   c. Individuals entering a DOE school building for the limited purpose to deliver or pick up items;
   d. Individuals present in a DOE school building to make repairs at times when students are not present in the building;
   e. Individuals responding to an emergency, including police, fire, emergency medical services personnel, and others who need to enter the building to respond to or pick up a student experiencing an emergency;
   f. Individuals entering for the purpose of COVID-19 vaccination;
   g. Individuals who are not eligible to receive a COVID-19 vaccine because of their age; or
   h. Individuals entering for the purposes of voting or, pursuant to law, assisting or accompanying a voter or observing the election.

"Works in-person" means an individual spends any portion of their work time physically present in a DOE school setting, DOE building, or charter school setting. It does not include individuals who enter such locations for the limited purpose to deliver or pick up items unless the individual is otherwise subject to this Order. It also does not include individuals present such locations to make repairs at times when students are not present in the building unless the individual is otherwise subject to this Order.

6. Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law.

7. This Order shall be effective immediately and remain in effect until rescinded, subject to the authority of the Board of Health to continue, rescind, alter or modify this Order pursuant to Section 3.01(d) of the Health Code.

Dated: September 15, 2021

Dave A. Chokshi, M.D., MSc
Commissioner

```
---------------------------------- X
In the Matter of the Arbitration
                                   X
          between
                                   X
BOARD OF EDUCATION OF THE CITY                  Re: Impact Bargaining
SCHOOL DISTRICT OF THE CITY OF     X
NEW YORK
                                   X
              "Department"
                                   X
          -and-
                                   X
UNITED FEDERATION OF TEACHERS,
LOCAL 2, AFT, AFL-CIO              X

              "Union"              X

---------------------------------- X
```

**APPEARANCES**

> **For the Department**
>   Renee Campion, Commissioner of Labor Relations
>   Steven H. Banks, Esq., First Deputy Commissioner
>   and General Counsel of Labor Relations

> **For the Union**
>   STROOCK & STROOCK & LAVAN, L.L.P.
>       Alan M. Klinger, Esq.

>   Beth Norton, Esq., UFT General Counsel
>   Michael Mulgrew, UFT President

**BEFORE:** Martin F. Scheinman, Esq., Arbitrator

**BACKGROUND**

The Union ("Union" or "UFT") protests the Department of Education's ("Department" or "DOE") failure to reach agreement on the impact of its decision mandating all employees working in Department buildings show proof they started the Covid-19 vaccination protocols by September 27, 2021. The Union contends the Department failed to adequately provide, among other things, for those instances where employees have proof of a serious medical condition making the vaccine a danger to their health, as well as for employees who have a legitimate religious objection to vaccines.

Most of the basic facts are not in dispute.

For those in the New York City ("NYC" or "City") metropolitan area, we are now in the 18th month of the Covid-19 pandemic. During that time, we have seen substantial illness and loss of life. There have been periods of significant improvement and hope, but sadly, we have seen resurgence with the Delta variant. Throughout this period, NYC and its municipal unions have worked collaboratively to provide needed services for the City's 8.8 million residents in as safe an environment as possible. Yet, municipal employees have often borne great risk. The Department and the UFT are no exception. The DOE and the UFT immediately moved to remote instruction and then later a hybrid model of both in-person and remote learning for the 2020-2021 school year. Educators at all levels strove to deliver the best experience possible under strained circumstances. For this

coming school year, both the DOE and the UFT have endeavored to return, as much as possible, to in-person learning. They have developed protocols regarding masking and distancing to effectuate a safe environment for the City's students and educators.

To this end, the Delta resurgence has complicated matters. In recognition of increased risk, there have been various policies implemented at City agencies and other municipal entities. Mayor de Blasio in July 2021 announced a "Vaccine-or-Test" mandate which essentially requires the City workforce, including the UFT's educators, either to be vaccinated or undergo weekly testing for the Covid-19 virus effective September 13, 2021.

Most relevant to this matter, on August 23, 2021, the Mayor and the NYC Commissioner of Health and Mental Hygiene, David A. Chokshi, MD, announced a new policy for those workforces in NYC DOE buildings. Those employees would be subject to a "Vaccine Only" mandate. That is, such employees would need to show by September 27, 2021, they had at least started the vaccination protocol or would not be allowed onto DOE premises, would not be paid for work and would be at risk of loss of job and benefits. This mandate was reflected in an Order of Commissioner Chokshi, dated August 24, 2021. That Order, by its terms, did not expressly provide for exceptions or accommodations for those with medical contraindications to vaccination or sincerely-held religious objections to inoculation. Nor did it address matters of due process with regard to job and benefits protection.

3

The UFT promptly sought to bargain the impact and implementation of the Vaccine Only mandate. A number of discussions were had by the parties but important matters remained unresolved.

On September 1, 2021, the UFT filed a Declaration of Impasse with the Public Employment Relations Board ("PERB") as to material matters. The City/DOE did not challenge the statement of impasse and PERB appointed me to mediate the matters. Given the exigencies of the imminent start of the school year and the coming of the September 27, 2021, mandate, together with the importance of the issues involved to the workforce, mediations sessions were held immediately on September 2, 3, 4 and 5, 2021, with some days having multiple sessions. Progress was made, and certain tentative understandings were reached, but significant matters remained unresolved. By agreement of the parties, the process moved to arbitration. They asked I serve as arbitrator.[1]

Arbitration sessions were held on September 6 and 7, 2021. During the course of the hearings, both sides were given full opportunity to introduce evidence and argument in support of their respective positions. They did so. Both parties made strenuous and impassioned arguments reflecting their viewpoints on this entire issue.

During the course of these hearings, I made various interim rulings concerning the impact of the "Vaccine Only" mandate. I then

[1] My jurisdiction is limited to the issues raised during impact bargaining and not with regard to the decision to issue the underlying "Vaccine Only" order.

4

directed the parties to draft language reflecting those rulings. Even though I am very familiar with the language of the current Collective Bargaining Agreement, as well as the parties' relationship since I am a member of their permanent arbitration panel and have served as a fact-finder and mediator during several rounds of bargaining, I concluded the parties are more familiar with Department policy and how leave and entitlements have been administered in accordance with prior agreements. As such, my rulings reflect both the understandings reached during the negotiations prior to mediation, those reached in the mediation process and the parties' agreed upon language in response to my rulings. All are included, herein.

I commend the parties for their seriousness of purpose and diligence in addressing these complicated matters. The UFT made clear it supports vaccination efforts and has encouraged its members to be vaccinated. Nonetheless, as a Union, it owes a duty to its members to ensure their rights are protected. The City/DOE demonstrated recognition of the importance of these issues, particularly with regard to employees' legitimate medical or religious claims. I appreciate both parties' efforts in meeting the tight timeline we have faced and the professionalism they demonstrated serving the citizens of the City and what the million plus students deserved. They have invested immense effort to insure such a serious issue was litigated in such a thoughtful way.

Yet, in the end, it falls to me, as Arbitrator, to arrive at a fair resolution of the matters at hand.

This matter is one of the most urgent events I have been involved with in my forty (40) plus years as a neutral. The parties recognized the complexity of the issues before me, as well as the magnitude of the work that lies ahead to bring this conflict to completion in a timely manner. For this reason, they understood and accepted the scope and complexity of this dispute could not be handled by me alone. They agreed my colleagues at Scheinman Arbitration and Mediation Services ("SAMS") would also be involved.

I want to thank my colleagues at SAMS, especially Barry J. Peek, for their efforts and commitment to implementing the processes to resolve this matter. This undertaking could not be accomplished by any single arbitrator.

## Opinion

After having carefully considered the record evidence, and after having the parties respond to countless inquiries. I have requested to permit me to make a final determination, I make the rulings set forth below. While some of the language has been drafted, initially, by the parties in response to my rulings, in the end the language set forth, herein, is mine alone. I hereby issue the following Award:

## I.   Exemption and Accommodation Requests & Appeal Process

As an alternative to any statutory reasonable accommodation

process, the City, the Board of Education of the City School District for the City of New York (the "DOE"), and the United Federation of Teachers, Local 2, AFT, AFL-CIO (the "UFT"), (collectively the "Parties") shall be subject to the following Expedited Review Process to be implemented immediately for full-time staff, H Bank and non-pedagogical employees who work a regular schedule of twenty (20) hours per week or more inclusive of lunch, including but not limited to Occupational Therapists and Physical Therapists, and Adult Education teachers who work a regular schedule of twenty (20) or more hours per week. This process shall only apply to (a) religious and medical exemption requests to the mandatory vaccination policy, and (b) medical accommodation requests where an employee is unable to mount an immune response to COVID-19 due to preexisting immune conditions and the requested accommodation is that the employee not appear at school. This process shall be in place for the 2021-2022 school year and shall only be extended by mutual agreement of the Parties.

Any requests to be considered as part of this process must be submitted via the SOLAS system no later than Monday, September 20, 2021, by 5:00 p.m.

A. Full Medical Exemptions to the vaccine mandate shall only be considered where an employee has a documented contraindication such that an employee cannot receive any of the three (3) authorized vaccines (Pfizer, Moderna, J&J)— with contraindications delineated in CDC clinical

7

considerations for COVID-19 vaccination. Note that a prior immediate allergic reaction to one (1) type of vaccine will be a precaution for the other types of vaccines, and may require consultation with an allergist.

B. Temporary Medical Exemptions to the vaccine mandate shall only be based on the following valid reasons to defer or delay COVID-19 vaccination for some period:

o Within the isolation period after a COVID-19 infection;

o Within ninety (90) days of monoclonal antibody treatment of COVID-19;

o Treatments for conditions as delineated in CDC clinical considerations, with understanding CDC guidance can be updated to include new considerations over time, and/or determined by a treating physician with a valid medical license responsible for the immunosuppressive therapy, including full and appropriate documentation that may warrant temporary medical exemption for some period of time because of active therapy or treatment (e.g., stem cell transplant, CAR T-cell therapy) that would temporarily interfere with the patient's ability to respond adequately to vaccination;

o Pericarditis or myocarditis not associated with COVID-19 vaccination or pericarditis or myocarditis associated with COVID-19 vaccination.

Length of delay for these conditions may vary, and the employee must get vaccinated after that period unless satisfying the criteria for a Full Medical Exemption described, above.

C. Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists).

D. There are cases in which, despite an individual having sought and received the full course of the vaccination, he or she is unable to mount an immune response to COVID-19 due to preexisting immune conditions. In these circumstances, each individual case shall be reviewed for potential accommodation. Medical accommodation requests must be documented in writing by a medical doctor.

E. The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee

Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a reason for the denial.

F. If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE within one (1) school day of the DOE's issuance of the initial eligibility determination. The request for appeal shall include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within forty eight (48) hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond forty eight (48) hours and permit the use of CAR days after September 27, 2021, for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination.

G. A panel of arbitrators identified by SAMS shall hear these appeals, and may request the employee or the DOE submit additional documentation. The assigned arbitrator may also request information from City and/or DOE Doctors as part of the review of the appeal documentation. The assigned

arbitrator, at his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the arbitrator requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall be held via Zoom telecommunication and shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the arbitrator's request shall be provided to the DOE at least one (1) business day before the hearing or the issuance of the written decision without hearing.

H. Appeal decisions shall be issued to the employee and the DOE no later than Saturday September 25, 2021. Appeal decisions shall be expedited without full Opinion, and final and binding.

I. While an appeal is pending, the exemption shall be assumed granted and the individual shall remain on payroll consistent with Section K below. However, if a larger number of employees than anticipated have a pending appeal as of September 27, 2021, as determined by SAMS, SAMS may award different interim relief consistent with the parties' intent. Those employees who are vaccinated and have applied for an

accommodation shall have the ability to use CAR days while their application and appeal are pending. Should the appeal be granted, these employees shall be reimbursed any CAR days used retroactive to the date of their initial application.

J. The DOE shall cover all arbitration costs from SAMS under this process. To the extent the arbitrator requests additional medical documentation or information from the DOE, or consultation with City and/or DOE Doctors, arranging and paying for such documentation and/or consultation shall be the responsibility of the DOE.

K. An employee who is granted a medical or religious exemption or a medical accommodation under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/or accommodation is in place. For those with underlying medical issues granted an accommodation under Section I(D), the DOE will make best efforts to ensure the alternate work setting is appropriate for the employee's medical needs. The DOE shall make best efforts to make these assignments within the same borough as

the employee's current school, to the extent a sufficient number of assignments exist in the borough. Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment.

L. The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school. The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth, herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution.

## II. <u>Leave</u>

A. Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the DOE and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose.

B. Except as otherwise noted, herein, this leave shall be treated consistent with other unpaid leaves at the DOE for all purposes.

C. During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from engaging in gainful employment during the leave period.

D. Employees who become vaccinated while on such leave without pay and provide appropriate documentation to the DOE prior to November 30, 2021, shall have a right of return to the same school as soon as is practicable but in no case more than one (1) week following notice and submission of documentation to the DOE.

E. Pregnancy/Parental Leave

   i. Any soon-to-be birth mother who starts the third trimester of pregnancy on or before September 27, 2021, (e.g. has a due date no later than December 27, 2021), may commence UFT Parental Leave prior to the child's birth date, but not before September 27, 2021.

   ii. No documentation shall be necessary for the early use of Parental Leave, other than a doctor's written assertion the employee is in her third trimester as of September 27, 2021.

   iii. Eligible employees who choose to start Parental Leave prior to the child's birth date, shall be required to first use CAR days until either: 1) they exhaust CAR/sick days,

at which point the Parental Leave shall begin, or 2) they give birth, at which point they shall be treated as an approved Parental Leave applicant for all purposes, including their prerogative to use additional CAR days prior to the commencement of Parental Leave.

iv. Eligible employees who have a pregnancy disability or maternity disability outside of the regular maternity period may, in accordance with existing rules, borrow CAR/sick days and use a Grace Period. This eligibility to borrow CAR/sick days does not apply to employees during the regular maternity recovery period if they have opted to use Parental Leave.

v. In the event an eligible employee exhausts CAR/sick days and parental leave prior to giving birth, the employee shall be placed on a leave without pay, but with medical benefits at least until the birth of the child. As applicable, unvaccinated employees may be placed in the leave as delineated in Section II(A).

vi. If not otherwise covered by existing Family Medical Leave Act ("FMLA") or leave eligibility, an employee who takes Parental Leave before the birth of the child shall be eligible to be on an unpaid leave with medical benefits for the duration of the maternity recovery period (i.e., six weeks after birth or eight weeks after a birth via C-Section)

    vii.   All other eligibility and use rules regarding UFT Parental Leave as well as FMLA remain in place.

## III. **Separation**

A. During the period of September, 28, 2021, through October 29, 2021, any employee who is on leave without pay due to vaccination status may opt to separate from the DOE. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused CAR days on a one (1) for one (1) basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the DOE, for non-disciplinary reasons. An employee who separates under this Section shall continue to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source (e.g., a spouse's coverage or another job).

B. During the period of November 1, 2021, through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned.

C. Beginning December 1, 2021, the DOE shall seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions

contained, herein, all parties retain all legal rights at all times relevant, herein.

September /0 , 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator


STATE OF NEW YORK     )
                      )   ss.:
COUNTY OF NASSAU      )


I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

September /0 , 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator

DOE.UFT.Impact Bargaining.awd

**APPENDIX**

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of November, two thousand twenty-one.

Before:      Pierre N. Leval,
José A. Cabranes,
Denny Chin,
*Circuit Judges.*

---

Michael Kane, William Castro, Margaret Chu,
Heather Clark, Stephanie Di Capua, Robert Gladding,
Nwakaego Nwaifejokwu, Ingrid Romero, Trinidad
Smith, Amaryllis Ruiz-Toro,

*Plaintiffs-Appellants,*        **ORDER**

v.        21-2678-cv

Bill de Blasio, in his official capacity as Mayor of
the City of New York, David Chokshi, in his
official capacity of Health Commissioner of the
City of New York, New York City Department of
Education,

*Defendants-Appellees.*

---

Matthew Keil, John De Luca, Sasha Delgado,
Dennis Strk, Sarah Buzaglo,

*Plaintiffs-Appellants,*

v.        21-2711-cv

The City of New York, Board of Education of the
City School District of New York, David Chokshi, in
his Official Capacity of Health Commissioner of the
City of New York, Meisha Porter, in her Official

Capacity as Chancellor of the New York City
Department of Education,

      *Defendants-Appellees.*

_____

  The motions of Plaintiffs-Appellants ("Plaintiffs") for an injunction pending appeal
having been heard at oral argument on November 10, 2021, and Defendants-Appellees
("Defendants") having represented to this Court that "the City is working toward making an
opportunity for reconsideration available more broadly to DOE employee[s] who unsuccessfully
sought religious exemptions pursuant to the arbitration award's appeal process," it is hereby

  **ORDERED** that this appeal is expedited and will be heard by a merits panel sitting on
November 22, 2021 (the "merits panel"). Pending further order by the merits panel,

1. Plaintiffs shall receive fresh consideration of their requests for a religious
   accommodation by a central citywide panel consisting of representatives of the
   Department of Citywide Administrative Services, the City Commission on Human
   Rights, and the Office of the Corporation Counsel.
2. Such consideration shall adhere to the standards established by Title VII of the Civil
   Rights Act of 1964, the New York State Human Rights Law, and the New York City
   Human Rights Law. Such consideration shall not be governed by the challenged criteria
   set forth in Section IC of the arbitration award for United Federation of Teachers
   members. Accommodations will be considered for all sincerely held religious
   observances, practices, and beliefs.
3. Plaintiffs shall submit to the citywide panel any materials or information they wish to be
   considered within two weeks of entry of this order. The citywide panel shall issue a
   determination on each request no later than two weeks after a plaintiff has submitted such
   information and materials. Within two business days of the entry of this order,
   Defendants shall inform plaintiffs' counsel how such information and materials should be
   transmitted to the citywide panel.
4. The deadline to opt-in to the extended leave program and execute any accompanying
   waiver shall be stayed for Plaintiffs, and no steps will be taken to terminate the plaintiff's
   employment for noncompliance with the vaccination requirement.
5. If a plaintiff's request is granted by the citywide panel, the plaintiff will receive backpay
   running from the date they were placed on leave without pay.
6. This order is intended only to provide for temporary interim relief until the matter is
   considered by the merits panel of this court, which panel may entirely supersede these
   provisions for interim relief, and the parties are at liberty to advocate to the merits panel
   for alteration of these provisions. Unless the merits panel has previously entered a
   superseding order, within two weeks of the conclusion of Plaintiffs' proceedings before
   the citywide panel, the parties shall inform the merits panel of the result of those
   proceedings and advise of any further relief being sought.

        FOR THE COURT:
        Catherine O'Hagan Wolfe, Clerk

_____

In the Matter of

**UNITED FEDERATION OF TEACHERS, LOCAL 2,**
**AFT, AFL-CIO,**

Charging Party,

-and-                                                                       <u>**CASE NO. U-32479**</u>

**BOARD OF EDUCATION OF THE CITY SCHOOL**
**DISTRICT OF THE CITY OF NEW YORK,**

Respondent.

_____

**ROBERT T. REILLY, GENERAL COUNSEL (ARIANA A. DONNELLAN of counsel), for Charging Party**

**KAREN SOLIMANDO, EXECUTIVE DIRECTOR OF LABOR RELATIONS (ALLISON S. BILLER of counsel), for Respondent**

<u>**BOARD DECISION AND ORDER**</u>

This case comes to us on exceptions filed by the Board of Education of the City School District of the City of New York (District) to a decision of an Administrative Law Judge (ALJ), granting an improper practice charge alleging that the District violated § 209-a.1 (d) of the Public Employees' Fair Employment Act (Act).[1]  The charge alleged that the District violated the Act when it unilaterally began placing a "flag" in its computer system next to the names of unit employees represented by the United Federation of Teachers, Local 2, AFT, AFL-CIO (UFT), who have been the subject of discipline, allegedly causing those employees to be denied opportunities for transfers and permanent assignments.  Originally, the ALJ dismissed the charge, finding that the flagging process was a duplicate, digitized version of certain documents in employees'

_____
[1] 54 PERB ¶ 4522 (2021).

personnel files and that the manner in which the District maintains employees' personnel files was not a mandatory subject of negotiations.[2]  On exceptions to that decision, the Board remanded the matter to the ALJ for further development of the record.[3]  On remand, the ALJ found that the "flagging" impacted terms and conditions of employment, and that the District had violated the Act by instituting the flagging system. On April 7, 2022, oral argument was held before the Board.

<u>EXCEPTIONS</u>

The District has filed nine exceptions to the ALJ's decision.  In its first two exceptions, the District asserts that the ALJ incorrectly found a violation of § 209-a.1 (d) of the Act on the basis that the evidence did not support her conclusion that employees are unable to inquire through the UFT "what specific documents are linked to a flag."  To the contrary, the District contends, the testimonial evidence was that the UFT could obtain this information through the District and could check its accuracy by inspecting the complete paper personnel file.[4]

The District's third and fourth exceptions reject the ALJ's finding that neither an employee nor her UFT representative has access to the Galaxy system and neither is able to personally view the flagged documents and whether they actually reflect the contents of the documents in the personnel file.  Rather, the District maintains that the ability to view the documents as maintained in the personnel file allows the UFT and its members to verify the flagged documents.  Additionally, the District asserts that the UFT

---

[2] 51 PERB ¶ 4561 (2018).
[3] 52 PERB ¶ 3009 (2019).
[4] Exceptions 1-2.

did not request such documents be produced, as such documents are redundant of the personnel file, and thus "there is no reason why the [District] would not provide this information."[5]

In exceptions five and six, the District argues that the ALJ erred in finding that "the record is clear that flagging affects principals' decisions whether to select a teacher in his or her school."  To the contrary, the District maintains that "the record shows that the purpose of the flagg[ing] procedure is to give principals the opportunity to consider or reconsider their decision after they have viewed the flagged documents."[6]  The District further claims that no evidence was introduced that any teacher failed to obtain a transfer on the basis that they had been "flagged" in the Galaxy system.

The District further alleges that there is no contractual right to a transfer, and that "flagged" employees have the same right to apply for a transfer as those who have not been flagged, and that there is no basis to require the digitization of the entire personnel files.  Additionally, the District contends that principals have multiple ways of learning about disciplinary histories, and, further, just as principals are not required to view the paper files, so too "they are not required to view the flagged documents" before making their hiring decision.[7]

The District further excepts to the ALJ's finding that "when viewing flagged documents, principals are viewing only negative information contained in an employees personnel file, without any information that might counterbalance the negative

---

[5] Exceptions 3-4.
[6] Exception 5.
[7] Exception 6, quoting 54 PERB ¶ 4522, at 4652-4653.

information such as years of positive observation reports or other positive material that may affect a principal's decision."[8]  Finally, the District excepts to the ALJ's finding that "the record shows that, in certain cases, letters annexed to a flag will be inaccurate if an employee is found, in arbitration, to have not engaged in the conduct set forth in a file letter, or to have engaged in a less severe misconduct."[9]

The UFT supports the ALJ's decision and contends that no basis has been demonstrated for reversal.

For the reasons given below, we affirm the ALJ's decision.

## FACTS

The facts in this matter are fully set out in the ALJ's thorough decision and are only addressed here as necessary to decide the exceptions.  On March 15, 2012, the District announced plans to initiate a new method of "flagging" negative work history in an online disciplinary support system that is linked to and accessible through its "Galaxy" computer system, an online budgetary system that provides a table of organization for all District offices and schools.

The flagging procedure makes information regarding an employees' disciplinary history with the District available to school principals when an employee is applying for a new position.  The information is only available to principals if they indicate in Galaxy that they intend to hire an individual for a position in their school.[10]  This process is

---

[8] Exception 7, quoting 54 PERB ¶ 4522, at 4653.
[9] Exception 8, quoting 54 PERB ¶ 4522, at 4653.
[10] Although the parties refer to the "hiring" of individuals, most of the individuals in question are already District employees, who are simply applying to transfer to a position at a different school or are seeking a permanent assignment.  Some applicants may also be former District employees, who are seeking to return to the District.

referred to as "intending" an employee in Galaxy.  If an employee's name has been flagged, a "flag symbol" will appear next to the employee's name when a principal "intends" the individual's name in Galaxy.[11]  The appearance of the "flag symbol" indicates that there is information that is available to the principal by clicking on the flag. One or more digitized documents may be linked to a flag and can be viewed by the "intending" principal.  However, the District has represented that the decision whether or not to click on the flag symbol and see the attached documents remains for the principal; the District "considers the *optional* review of the disciplinary support unit flag by hiring Principal/supervisor as an opportunity to learn about an employee's prior history-similar to checking reference[s] before making a hiring decision."[12]

When an "intending" principal moves to proceed, a dialogue box appears, headed "Notification of Prior Disciplinary Action."  This dialogue box does not provide any hyperlink to pdf documents.  It states that the prospective hire/transfer "has been disciplined (on occasion(s) due to a prior report(s) of allegations of misconduct that have been substantiated.")  The box instructs that for the intending principal to obtain more information she should "contact your Senior Field Counsel or CFN HR Director."[13]

The dialogue box then states: "If you wish to proceed with the action to intend to bring this individual onto your budget please click below to acknowledge that you are aware of and acknowledge the prior disciplinary action concerning this individual."[14]

---

[11] District Brief at 6, citing Jt Ex 1.  As the "flag symbol" is not reproduced in the cited Exhibit, and the system is not available to the UFT, we adopt the District's characterization for purposes of this decision.
[12] *Id* (citing Tr, at 83-84 (Rodi) emphasis in original).
[13] Jt Ex 1.
[14] *Id*.

"Intending" principals are given the option in the Galaxy system of proceeding with the hire or of cancelling the hire.[15] In the event that the principal continues with "intending" the individual to the job, he or she is required to acknowledge awareness of the prior disciplinary action concerning the individual.[16]

At the bottom of the dialogue box, two buttons allow the "intending" principal to either "Apply" (thereby submitting a final decision either to proceed with or to cancel the hire) or to "Cancel" (thereby allowing the "intending" to pursue further information, either through the flag symbol and its attached documents, or the resources specified in the dialogue box).[17]

Katherine Rodi, Director of the District's Office of Employee Relations, oversees the Disciplinary Support Unit (DSU), which manages the District's online disciplinary support system. The DSU tracks employee discipline and is responsible for flagging employee names when appropriate. The DSU began flagging employee names in approximately May of 2012.

Rodi testified that the DSU will place a flag next to an employee's name in the Galaxy system only when two criteria are met. First, a substantiated report of discipline or misconduct must have been issued by one of the District's three investigatory bodies: the Office of the Special Commissioner of Investigation, the Office of Special Investigations, or the Office of Equal Opportunity.[18] Second, the DSU must have

---

[15] *Id.*
[16] *Id.*
[17] Jt Ex 1.
[18] Tr, at 73, 76.

evidence that the employee received a copy of the relevant disciplinary document.[19] That evidence normally consists of the employee's signature on the letter to be flagged, or on a mail receipt.[20] If those criteria have been met, the DSU will manually flag the employee's name in the Galaxy system and will link a copy of the disciplinary document in question to the flag.

Rodi explained the several steps that must occur before a document is issued that can lead to the flagging of the employee's name in Galaxy. Initially, one of the three investigatory bodies mentioned above must have conducted an investigation that resulted in a report substantiating an allegation of wrongdoing against the employee. Next, the principal must meet with the employee to discuss the report. If the principal issues a disciplinary letter as a result of the meeting, that letter may serve as a basis for a flag. As set forth above, the DSU must also have evidence that the employee received a copy of that letter.[21] Rodi testified that only documents that are in an employee's personnel file can serve as a basis for flagging an employee's name. If an employee files a rebuttal to the letter of discipline, the rebuttal letter is also linked to the flag in Galaxy.[22] Disciplinary letters issued by principals due to misconduct that have not been substantiated by an investigatory body, such as a letter admonishing an employee for lateness, may not serve as a basis for flagging an employee's name and cannot be annexed to a flag.[23]

---

[19] Tr, at 73.
[20] Tr, at 81.
[21] Tr, at 90.
[22] Tr, at 81.
[23] Tr, at 108.

Other documents that can be linked to a flag are those resulting from a disciplinary proceeding held pursuant to § 3020-a of the New York State Education Law (EL), but only if the employee was brought up on charges based on misconduct that is set forth in a disciplinary letter that meets the criteria for imposing a flag. An award or settlement issued as part of such a proceeding can be attached to a flag, but only if the award or settlement includes a finding or admission of culpability relating to the initial disciplinary letter.[24]

A flag remains next to an employee's name as long as the underlying disciplinary letter remains in the employee's file.[25] Rodi testified that the DSU will remove a flag or a document linked to a flag if an award issued in a EL § 3020-a disciplinary proceeding dismisses the charges against an employee based on a finding that the alleged misconduct did not occur, and if the award directs the District to remove the underlying disciplinary letter from the employee's personnel file.[26] If an award finds that the misconduct occurred, but is insufficient for dismissal, the flag will remain next to the employee's name, because the underlying letter finding misconduct remains in the employee's personnel file. The DSU will also remove a flag if a settlement requires it to remove the disciplinary letter on which the flag was based. Similarly, the DSU will remove a flag if an employee successfully pursues a grievance challenging a letter on which a flag is based, and the grievance decision directs the District to remove that

---

[24] Tr, at 90-91. The EL § 3020-a disciplinary charges are not linked to a flag. Tr, at 109.
[25] Tr, at 113.
[26] Tr, at 95, 98.

letter from the employee's personnel file.[27]

According to the District, all documents linked to a flag are already included in employees' personnel files. Although the UFT is unable to view the flags and the documents linked to them, it does not dispute that the linked documents are intended to be limited to the discipline related documents in each individual's personnel files. Those paper files are maintained at the school where an employee is currently employed, or was last employed. Because the District has not digitized the entire contents of employee personnel files, principals cannot view them online. To view a copy of an employee's personnel file, a principal considering whether to hire an employee must contact the school where the employee's file is kept, and request that a copy be made and sent to him or her. A principal should see, in an employee's personnel file, any document that has been flagged in Galaxy.

Rodi testified that the flag serves a purely informational function in assuring that a hiring principal is aware of flagged information. She further testified that flagging an employee's name does not restrict an employee's ability to apply for a new position or impose any restriction or limitation on the employee. Rodi testified that principals are not required to take, or refrain from taking, any action when an employee's name has been flagged; they may, if they so choose, hire an employee whose name is flagged.[28] Rodi testified that she personally knows principals who have hired employees whose

---

[27] Tr, at 113. The collective bargaining agreement between the parties includes a grievance procedure that allows employees to seek the removal of disciplinary letters from their personnel files.
[28] Tr, at 87-88.

names are flagged in Galaxy.[29]

Other than those working in the DSU, only an employee's current principal and the principal who intends to hire the individual can view whether an employee's name is flagged in Galaxy.[30]  However, before their names are flagged, employees have received a copy of the letter of misconduct that is linked to the flag and have been advised that the document has been placed in their personnel file.

Amy Arundell, the UFT's Director of Personnel, testified that she first learned of the flagging system in October 2012 when Mathew Polisheck, a unit member, called her and told her that a principal rescinded his offer of a position and told him that he could not hire him because there was a flag on his file in Galaxy.[31]  After Polisheck contacted her, Arundell received complaints from other employees who stated that they had interviewed for a position and were later told that they could not be hired, or that the principal had reconsidered his or her decision, because a flag was placed on their file in Galaxy.[32]  In Polisheck's case, Arundell learned that the principal decided not to hire him after learning of the existence of a substantiated case of discipline against Polisheck and a EL § 3020-a disciplinary proceeding.[33]

Prior to the implementation of the flag symbols, principals could only view online an employee's service history, which shows whether an employee was rated effective or ineffective in his or her yearly evaluation, and whether an employee was suspended.[34]

---

[29] Tr, at 123.
[30] Tr, at 83.
[31] Tr, at 154-155.
[32] Tr, at 161.
[33] Tr, at 180.
[34] Tr, at 89, 126.

To view an employee's disciplinary history, an "intending" principal would have to request the employee's personnel file from the employee's school.[35]

<u>DISCUSSION</u>

A public employer violates its duty to negotiate in good faith, in violation of § 209-a.1 (d) of the Act, when it unilaterally implements a change to a mandatorily negotiable term or condition of employment.[36]  We have long held that procedures for transfer and transfers themselves "are a mandatory subject of negotiations."[37]

On remand, the ALJ reassessed her prior finding that Rodi's testimony demonstrated that "[e]mployees may inquire through the UFT whether their name has been flagged in Galaxy *and what documents are linked to a flag*."[38]  As the ALJ correctly noted, we held that, although Rodi's testimony supports the first part of her finding, it does not support the latter part of that finding, and hence we remanded this issue for a full review of the record.[39]

On her review of the record, the ALJ concluded that the record does not support a finding that employees may inquire through the UFT to learn what specific documents

---

[35] Tr, at 78.

[36] *See, eg, Town of Islip v NYS Pub Empl Relations Bd*, 23 NY3d 482, 484, 47 PERB ¶ 7006 (2014); *Patchogue-Medford Union Free Sch Dist*, 30 PERB ¶ 3041, 3094 (1997); *Monticello Cent Sch Dist*, 22 PERB ¶ 3002, 3008 (1989), *enforced* 22 PERB ¶ 7022 (Sup Ct, Albany County 1989).

[37] *City of Buffalo*, 9 PERB ¶ 3024, 3040 (1976); *see also White Plains PBA*, 9 PERB ¶ 3007, 3009 (1976) ("Assignment of 'both permanent jobs and work details on the basis of preference and seniority is a term and condition of employment and thus a mandatory subject of negotiations.'"), quoting *City of Albany [Albany Firefighters]*, 7 PERB ¶ 3142, 3147 (1974).

[38] 52 PERB ¶ 3009, at 3043 (emphasis added by the ALJ).

[39] 51 PERB ¶ 4561, at 4764.

are linked to a flag."[40]

From there, the ALJ moved to consideration of the impact of this finding on the
claims before her.  The ALJ's findings of fact and law here are instructive:

> The record is clear that flagging affects principals' decision whether
> to select a teacher for a position in his or her school.  Principals see
> flags, and the documents linked to a flag, when they are in the
> process of selecting a teacher for a position in their school.  At that
> point, the decision to select a teacher is not final.  In fact, the
> purpose of the flagged procedure is to give principals the opportunity
> to consider, or reconsider, their decision once they have viewed the
> flagged documents.
>
> Although the flagged documents are included in an employee's
> official school file, the record shows that principals are not required
> to, and often do not, request a copy of a teacher's entire official file
> before finally deciding whether to select an employee for a position in
> their school.  That is apparent from the fact that the record shows
> that only *if* a principal makes that request does the principal receive
> a copy.  It is also apparent from the fact that the flagging system was
> created for that reason; that is, principals had placed employees in
> their school without being aware of the employees' negative
> disciplinary history involving serious matters.
>
> Further, when viewing flagged documents, principals are viewing
> only negative information contained in an employee's file, without
> any information that might counter-balance the negative information,
> such as years of positive observation reports or other positive
> material, that may affect a principal's decision whether or not to
> select an employee for a position.  The record also shows that, in
> certain cases, letters annexed to a flag will be inaccurate if an
> employee is found, in arbitration, to have not engaged in the conduct
> set forth in a file letter, or to have engaged in a less severe
> misconduct.[41]

---

[40] 54 PERB ¶ 4522, at 4652.  As neither the District nor the UFT submitted additional
evidence, the ALJ relied on the evidence at the hearing before her; in her review, she
based her determination on the limited information Arundell received from Rodi, that is,
whether specific individuals had been flagged, and not the documents attached to the
flags.  *Id*.
[41] 54 PERB ¶ 4522, at 4563.

As the ALJ found, Rodi testified that flagged letters are only removed from Galaxy if the arbitration award specifically directs that the letter be removed from a teacher's official file. Therefore, a principal may view a flagged letter when the conduct underlying that letter has been held in arbitration to either not have occurred or to have occurred in a different manner or degree than that which is set forth in the flagged letter, if the arbitration award does not specifically direct removal of the letter.

The ALJ's factual determinations, particularly her credibility determinations, "are generally entitled to great weight unless there is objective evidence in the record compelling a conclusion that the credibility finding is manifestly incorrect."[42] No such objective evidence has been raised before us. The ALJ reasonably exercised her discretion in taking a closer look at the specific testimony of both Arundell and of Rodi on remand. Moreover, both parties had the opportunity to submit further evidence on the factual issues. Neither availed themselves of the opportunity, and they are now bound by the evidence they chose to submit.

We affirm the ALJ's finding that the District made a change to the procedures to be used to fill a position, a mandatory subject of negotiations. Prior to the implementation of the "flagging" system, an "intending" principal who wished to see an employee's disciplinary history would request the employee's full personnel file from the employee's school. The personnel file would include not only the employee's negative

---

[42] *Pine Valley Cent Sch Dist*, 51 PERB ¶ 3036, 3160 (2018), quoting *Village of Scarsdale*, 50 PERB ¶ 3007, n 51 (2017), *confd sub nom Village of Scarsdale v NYS Pub Empl Relations Bd*, 55 PERB ¶ 7008 (2d Dept 2022). *See also Pleasantville Union Free Sch Dist*, 51 PERB ¶ 3024, 3100 (2018); *Village of Endicott*, 47 PERB ¶ 3017, 3051 (2014).

disciplinary history, but also any positive history, such as positive performance evaluations, commendations from managers, and awards, that might counterbalance the disciplinary history. Under the new "flagging" system, however, such positive history is no longer available to "intending" principals, who receive only negative information on employees they intend to hire.

Moreover, prior to the change at issue here, whether to look at the personnel file at all was left to an "intending" principal's discretion. Now, the negative portion of an employees' personnel file is fed automatically to "intending" principals regardless of whether they express a desire to see the employee's personnel file or not. As the District concedes, this data is meant to be taken into consideration by the "intending" principals as they make their hiring decisions.

These changes, both the automatic nature of providing the information and providing solely the negative portions of the employee's personnel file, represent changes to the prior procedure as to effectuating transfers within the District. These changes have an adverse effect on employees' terms and conditions of employment as the "intending" principle receives a purely negative, decontextualized version of the personnel file, unlike in the past, where "intending" principals, if they saw the personnel file at all, would see the full personnel file, including both positive and negative history. Consistent with our prior precedent, we find these unilateral changes to the procedure used to fill positions affect terms and conditions of employment, and are a mandatory

subject of bargaining.[43]  For that reason, we affirm the ALJ's finding that the District violated the Act.

We do not find the adoption of flagging to be in and of itself a disciplinary action. The record is clear that teachers who have been flagged remain eligible to apply for transfers just as do their colleagues who have not been.  Rather, we grant relief because of the unilateral change of procedures impacting terms and conditions of employment—here, by procedurally incentivizing principals to peruse and assess prior discipline, or, at a minimum, requiring them to acknowledge the existence of such discipline.  For these reasons, we find that the unilateral adoption of this new procedure without negotiation with the UFT violates § 209-a.1 (d) of the Act.

The charge also states that "[i]n addition, none of the affected employees would have an opportunity to review the information upon which the 'flag symbol' was entered or to ascertain or contest whether the disciplinary action the entry is based on actually occurred or is in error."[44]  Later in the charge, the UFT asserts that the District "failed to bargain in good faith over a mandatory subject of bargaining—employee discipline, *transfer* and other personnel actions—and therefore committed an improper practice

---

[43] *See Niagara Falls Police Captains and Lieutenants Assn*, 33 PERB ¶ 3058, 3161 (2000) ("We have held . . . that the procedures to be used to fill a position . . . are a mandatory subject of negotiation."), citing *Schenectady Patrolmen's Benevolent Assn*, 21 PERB ¶ 3022 (1988); *Dutchess County BOCES Faculty Assn, NEA/NY*, 17 PERB ¶ 3120 (1984), *confd sub nom Matter of Dutchess County Bd of Coop Educ Serv*, 122 AD2d 845, 19 PERB ¶ 7018 (2d Dept 1986); *White Plains Police Benevolent Assn*, 9 PERB ¶ 3007 (1976).  *See also Dutchess Community College and County of Dutchess*, 46 PERB ¶ 3009, 3016 (2013).  *See generally City of Watertown v State of NY Pub Empl Relations Bd*, 95 NY2d 73, 33 PERB ¶ 7007 (2000) ("bargaining is mandatory if the procedures qualify as a "term and condition" of employment").
[44] Charge, ¶ 6.

under the Act."[45]  Among the relief sought, the charge requested an order "compelling the Board to negotiate in good faith with the UFT regarding the implementation, procedures for and impact of the employee 'flag symbols.'"[46]

We note that we have long held that "the right of an employee to review his personnel file bears a direct and significant relationship to working conditions, including possible demotion, promotion, and discipline, rendering the demand mandatorily negotiable."[47]  Here, the District has culled out the disciplinary history portion of the personnel file, and made only that portion easily and immediately available for principals to consult in determining whether or not to finalize the decision to grant an employee's request to transfer, or an application to a promotional position.  Indeed, by requiring the "intending" principal to acknowledge that she is aware that the employee has a disciplinary history, the District has created an incentive for the "intending" principal to consult the digitized materials.

The convenience of accessing the digital excerpt from the personnel file, rather than taking the steps to obtain the full paper file, mean that the excerpted digital materials are more likely than not to be used in place of the full file in making decisions as to transfers, promotions and other lateral hiring or recall decisions.  However, as the UFT has alleged, and the District has admitted, neither the UFT nor the individual

---

[45] Charge, ¶ 9 (emphasis added).
[46] Charge, ¶ 12.
[47] *City of Schenectady*, 21 PERB ¶ 3022, 3049 (1988); *Town of Carmel,* 29 PERB ¶ 3053, 3121-3122, n 3 (1996) ("notice of entries in personnel files" a mandatory subject). *See  generally Niagara Falls Police Club (Drinks-Bruder)*, 52 PERB ¶ 3007, 3029 (2019) (union satisfied its statutory obligation by successfully resolving a previously filed unit-wide grievance in the matter so that everyone, including the charging party, had the opportunity to review their personnel files).

employee has the ability to access the "flag symbol" and the materials attached thereto, to ascertain if they are in fact materials that have been properly placed, and properly remain, in the personnel file.

The reasons that underlay our finding in *City of Schenectady* that access to paper personnel files is a mandatory subject apply with full force and vigor to these digitized disciplinary history excerpts, which are every bit as likely, if not more so, to affect working conditions, including transfer, promotion and other opportunities. We therefore find that the District violated § 209-a.1 (d) of the Act by unilaterally instituting the flagging system without having negotiated with the UFT as to notification to employees that they have been "flagged" and access to the materials attached to the "flag symbol" sufficient to permit verification that such materials were placed in the employees' personnel files and properly remain within them.

These same factors lead us to conclude that the flagging system is not, as the District argued, a mere optional "opportunity to learn about an employee's prior history-similar to checking reference[s] before making a hiring decision." Moreover, the District concedes that this data is meant to be taken into consideration by the "intending" principals as they make their hiring decisions.

Taken as a whole, then, the flag, the dialogue boxes encouraging the intending principals to either review the flagged documents, seek information through Senior Field Counsel or the CFN HR Director, and the requirement, prior to finalizing or canceling the transaction, that the "intending" principal acknowledge the existence of the disciplinary history, effectively amount to the addition of a new procedure with respect to

such transfers.

Additionally, the flagging process may reasonably be found to establish a new criterion for such appointments, that is, the consideration of the applicant's disciplinary history. As we have long held, a "criterion for appointment or promotion is a managerial prerogative beyond the scope of mandatory negotiation, if applicable only to prospective employees or to future promotion of current employees."[48] The same considerations and the same result applies to criteria for transfers.[49] Accordingly, we find that the UFT did not establish a violation of § 209-a.1 (d) of the Act by requiring principals to consider the disciplinary history of applicants for transfer or promotional positions.

However, we affirm the ALJ's finding that the "flagging" process is a mandatory subject of negotiations to the extent that the process affects terms and conditions of employment by denying employees notice that they have been "flagged" and an opportunity to view the materials attached to the "flag symbol" and to contest its appropriateness for inclusion as part of the personnel file. To the extent that the District has imposed a new criteria for transfer and promotional applications, the consideration of the applicant's disciplinary history, we find that no violation of the Act has been established. We note that our decision is made without prejudice to the right to bargain upon demand the impact of this decision.

---

[48] *Rensselaer City Sch Dist*, 13 PERB ¶ 3051, 3084-3085 (1980). *See also City of Niagara Falls*, 33 PERB ¶ 3058, 3161-3162 (2000); *City of Buffalo*, 29 PERB ¶ 3023, 3053 (1996) (qualifications non-mandatory); *Addison Cent Sch Dist*, 13 PERB ¶ 3060, (1980) (criteria for promotion non-mandatory); *see generally Levitt v Bd of Collective Bargaining of the City of NY*, 79 NY2d 120, 128, 29 PERB ¶ 7516 (1992).
[49] *City of Schenectady*, 21 PERB ¶ 3022, at 3050-3051.

IT IS, THEREFORE, ORDERED that the District will forthwith:

1.      Negotiate in good faith with the UFT procedures by which unit employees who have been the subject of discipline are notified that they have been "flagged" in its "Galaxy" computer system, are able to verify the accuracy and propriety of inclusion of supporting documentation attached to the flag symbol, and seek removal of such materials as are not properly part of the personnel file; and

2.      Sign and post the attached notice at all physical and electronic locations customarily used by it to post notices to unit employees.

DATED:  June 13, 2022
            Albany, New York

_____
John F. Wirenius, Chair

_____
Anthony Zumbolo, Member

_____
Rosemary A. Townley, Member

# NOTICE TO ALL EMPLOYEES

**PURSUANT TO**
**THE DECISION AND ORDER OF THE**

**NEW YORK STATE**
**PUBLIC EMPLOYMENT RELATIONS BOARD**

**and in order to effectuate the policies of the**

**NEW YORK STATE**
**PUBLIC EMPLOYEES' FAIR EMPLOYMENT ACT**

**we hereby notify all employees of the Board of Education of the City School District of the City of New York (District) in the unit represented by the United Federation of Teachers, Local 2, AFT, AFL-CIO (UFT), that the District will forthwith:**

1. Negotiate in good faith with the UFT procedures by which unit employees who have been the subject of discipline are notified that they have been "flagged" in its "Galaxy" computer system, are able to verify the accuracy and propriety of inclusion of supporting documentation attached to the flag symbol, and seek removal of such materials as are not properly part of the personnel file.


Dated . . . . . . . . . .        By . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

on behalf of the **BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK**

*This Notice must remain posted for 30 consecutive days from the date of posting, and must not be altered, defaced, or covered by any other material.*

At an IAS Term, City Part 22 of the
Supreme Court of the State of New York,
held in and for the County of Kings, at the
Courthouse thereof at 360 Adams St.,
Brooklyn, New York on the 19th day of
December 2022.

P R E S E N T :

HON. GINA ABADI,
J.S.C.

---

MELANIE KAMBOURIS, AMANDA SEMEL, ANDREW
FOSSATTI, ANNA STITHOS, CANDICE WITTMER,
CATHERINE PETRONE, COURTNEY KASSEBAUM,
DANIELLE ELAZEH, DANIELLE CALAPAI, DIANA
HARRISON, ERICA WILHELM, ERIETA MYFTARAJ,
GENEVIEVE GIOELI, GREGORY MAST, HENNA
FOSSATTI, JACQUELINE LANGONE, JENA FORGIONE,
JENNIFER VILLALTA, JENNIFER FICETO, JESSICA
MAST, KIM MARINELLI, LAUREN HORAN, LISA
IRVINE, MARSIDA ASHAFI, STEFANIE RUDE,
SUZANNA CIANCI, TIFFANY KLEIN, VICKY STITHOS,
RESMIGE GIOVANNA, KATHERINE GANIARIS,

Index No.: 518863/2022
Motion Seq: 1 & 2

DECISION/ORDER

Petitioners,

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK, DAVID C. BANKS, in his
Official capacity as Chancellor and DANIEL WEISBERG in
his official capacity as First Deputy Chancellor,

Respondents.

---

Recitation, as required by CPLR § 2219(a), of the papers considered in the review of this motion:

| Papers | NYSCEF Numbered |
|---|---|
| Notice of Motion/Cross Motion/Order to Show Cause and Affidavits (Affirmations) Annexed.................................. | 3 - 38, 48, 49-57, 59 |
| Opposing Affidavits (Affirmations)................................... | 42 - 46, 58 |
| Reply Affidavits (Affirmations)....................................... | 47 |

Upon the foregoing papers in this hybrid special proceeding pursuant to CPLR Articles

78 and 63 seeking declaratory and injunctive relief, petitioners move by order to show cause

1

(OSC), motion sequence 1, for: 1) a declaratory judgment finding that respondent New York City Department of Education (DOE) violated tenured petitioners' rights pursuant to Education Law [EL] §§ 3020 and 3020-a; 2) a declaratory judgment that the DOE's determination deprived petitioners of property without due process of law guaranteed under article 1 section 6 of the New York State Constitution; 3) a declaratory judgment that the DOE took disciplinary action without a just cause; 4) a declaratory judgment that the DOE's determination is null, void, and unenforceable; 5) a temporary, preliminary, and permanent injunction enjoining the DOE from enforcing the determination; 6) a temporary restraining order and a preliminary injunction reinstating petitioners, unless, and until, the DOE lawfully commences disciplinary proceedings; 7) a declaratory judgment that the DOE took disciplinary action in violation of lawful procedure pursuant to CPLR 7803; and 8) an award of back pay and any other compensation petitioners would have received but for the DOE's determination. By subsequent OSC, motion sequence 2, petitioners seek: 1) a temporary restraining order staying the DOE's determination to assign petitioners to reassignment centers; 2) a temporary restraining order staying the DOE from altering petitioners' employment status that they had prior to April 19, 2022, unless, and until, the DOE commences disciplinary proceedings set forth in EL §§ 3020, 3020-a, and in accordance with petitioners' due process rights guaranteed under NY Const. art I, § 6; 3) a preliminary and permanent injunction annulling the DOE's determination to reassign petitioners; 4) a preliminary injunction reinstating petitioners; and 5) attorneys' fees and costs.

### *Factual and Procedural Background*

The 30 petitioners in this proceeding are employees of the DOE, 27 of whom are teachers or school professionals with tenure. On August 24, 2021, Dr. Dave A. Chokshi, Commissioner of the New York City Department of Health and Mental Hygiene, issued an order (Vaccine

2

Mandate Order) requiring all employees of the DOE to submit proof, by September 27, 2021,

that they were fully vaccinated against Covid-19; or received a single dose vaccine, or the second

dose of a two-dose vaccine; or received the first dose of a two-dose vaccine, with the additional

requirement to provide proof of the second dose thereafter. Petitioners thereafter submitted

purported proof of compliance with the Vaccine Mandate Order by uploading to the relevant

DOE web portal CDC Covid-19 Vaccination Record Cards (Vaccination Cards) indicating

receipt of the vaccine.

Following submission of the Vaccination Cards, petitioners received an e-mail from the

DOE, dated April 19, 2022, which stated:

> "We have received information that the proof of vaccination that
> you uploaded to the DOE Vaccine Portal, pursuant to the New
> York City Health Commissioner's Order requiring vaccination of
> all NYCDOE staff, was fraudulent. Compliance with that Order is
> a condition of NYCDOE employment. Since we have reason to
> believe that you have not complied with that Order, effective
> Monday, April 25, 2022, **you are being placed on Leave Without
> Pay** with benefits until further notice. You should not report to
> your school/work location after the April vacation and your
> school/office will be notified of this change in your status"
> (emphasis in original).

NYSCEF Docs No 5 and 45.

According to the DOE, the Special Commissioner of Investigation for the New York City

School District ("SCI") informed the DOE's Division of Human Resources ("DHR") of a list of

DOE employees "implicated" in a "fraudulent vaccination operation investigation, for whom SCI

had determined that there was a high probability that they had not in fact received required

vaccinations," contrary to the information the employees had submitted to the DOE. *See*

Affidavit of Mallory O. Sullivan, NYSCEF Doc No 44. In his affidavit, SCI Deputy

Commissioner Gerald P. Conroy avers that while the Vaccination Cards submitted by these

3

employees "purport to show that the employees received the required COVID-19 vaccination. . .
evidence obtained by SCI to date demonstrates that this is very likely to be untrue." Conroy
states that his affidavit is based "upon personal knowledge and upon information and belief, the
sources being the files of [SCI], documents obtained from the DOE, the New York State
Department of Health (pursuant to an SCI subpoena), two district attorneys' offices within the
State of New York, as well as conversations with representatives of the aforementioned offices
and four additional law enforcement agencies." Affidavit of Gerald P. Conroy, NYSCEF Doc No
45.

The placement of petitioners on leave without pay resulted in the filing of the instant
Article 78 petition along with the initial OSC, motion sequence 1, setting forth petitioners'
request for declaratory and injunctive relief, including reinstatement to their assignments with
pay. The OSC, motion sequence 1, was signed on July 1, 2022 by Justice Karen B. Rothenberg.

On or about August 8, 2022, the DOE sent each petitioner an e-mail stating:

> "We are writing with an update to the prior notice you received
> regarding the proof of vaccination that you uploaded to the DOE
> Vaccine Portal.
>
> "Effective September 6, 2022, you will be returned to payroll.
> Upon your return, NYCDOE will conduct an internal investigation
> related to whether the proof that you uploaded is fraudulent.
>
> "You will be reassigned during the pendency of such investigation.
> This assignment is pending; please check your email on or after
> September 1, 2022 for directions on where to report."

NYSCEF Doc No 54.

Following petitioners reassignment, petitioners brought a subsequent OSC, motion
sequence 2, seeking a preliminary and permanent injunction annulling the DOE's determination
reassigning petitioners pending investigation of the validity of their Vaccination

4

Cards and to restore petitioners to their previous assignments. The OSC, motion sequence 2, was signed by Justice Richard Velasquez on August 30, 2022 and did not grant the preliminary injunction.

### *Discussion*

In an article 78 proceeding, the court considers "only whether the determination was made in violation of lawful procedure, was affected by an error of law, was arbitrary and capricious, or was an abuse of discretion." *Matter of Halpert v Shah*, 107 AD3d 800, 801 (2d Dept 2013; *see* CPLR § 7803(3); *Matter of Ward v City of Long Beach*, 20 NY3d 1042 (2013); *Matter of Halperin v City of New Rochelle*, 24 AD3d 768, 770 (2d Dept 2005). "Under this standard, courts examine whether the action taken by the agency has a rational basis and will overturn that action only where it is taken without sound basis in reason or regard to the facts, or where it is arbitrary and capricious." *Matter of Halpert*, 107 AD3d at 801-802 (citations and internal quotation marks omitted); *see Matter of Wooley v New York State Dept. of Correctional Servs.*, 15 NY3d 275, 280 (2010); *Matter of Peckham v Calogero*, 12 NY3d 424, 431 (2009); *Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 232 (1974); *Matter of Deerpark Farms, LLC v Agricultural & Farmland Protection Bd. of Orange County*, 70 AD3d 1037, 1038 (2d Dept 2010).

In addition, the decision to grant or deny an injunction lies within the sound discretion of the Supreme Court. *See Congregation Erech Shai Bais Yosef, Inc. v Werzberger*, 189 AD3d 1165, 1166-1167 (2d Dept 2020); *Matter of Goldfarb v Ramapo*, 167 AD3d 1009, 1010 (2d Dept 2018). "A permanent injunction is a drastic remedy which may be granted only where the plaintiff demonstrates that it will suffer irreparable harm absent the injunction." *144-80 Realty*

5

*Assocs. v 144-80 Sanford Apartment Corp.,* 193 AD3d 723, 725 (2d Dept 2021) quoting *Merkos L'Inyonei Chinuch, Inc. v Sharf,* 59 AD3d 403, 408 (2d Dept 2009); *see Icy Splash Food & Beverage, Inc., v Henckel,* 14 AD3d 595, 596 (2d Dept 2005). Moreover, "[i]njunctive relief is to be invoked only to give protection for the future . . . to prevent repeated violations, threatened or probable, of the [parties'] rights." *Swartz v Swartz,* 145 AD3d 818, 828-29 (2d Dept 2016) (internal quotation marks and citations omitted); *see Merkos L'Inyonei Chinuch, Inc. v Sharf,* 59 AD3d at 408.

Here, the essential argument of petitioners is that the determinations of the DOE, in both placing them on leave without pay and further assigning them to a reassignment center, or "rubber room" rather than the classroom was arbitrary and capricious and contrary to law insofar as these actions constituted disciplinary actions without affording petitioners their due process rights pursuant to EL §§ 3020, 3020-a and the New York State Constitution.

EL § 3020 provides, in relevant part:

> "1. No person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement covering his or her terms and conditions of employment."

EL § 3020-a provides the exclusive method of disciplining a tenured teacher in New York and requires the filing of charges (EL § 3020-a [1]), a determination of whether probable cause exists to bring a disciplinary proceeding (EL § 3020-a [2]) and a hearing before an arbitrator (EL § 3020-a [3]) prior to the imposition of "a reprimand, a fine, suspension for a fixed time without pay or dismissal." EL § 3020-a (4).

6

Contrary to the DOE's argument, the reassignment of the petitioners *with pay* does not render the petition and original OSC moot, as petitioners seek, in the second OSC as well as the original OSC, reinstatement of petitioners' employment status and assignments that they held prior to April 19, 2022, unless, and until, respondents commence disciplinary proceedings as set forth in EL §§ 3020 and 3020-a. In this matter, the reassignments did not involve transfers to similar teaching positions at other locations or assignments which involved the application of petitioners' areas of expertise. Instead, the reassignments were made to centers where, according to one petitioner, teachers are given "tedious" and "mindless" assignments and tasks. Affidavit of Melanie Kambouris, NYSCEF Doc No. 55. The reassignment was not made pending a hearing on specified charges,[1] even though the DOE made a clear accusation of wrongdoing by the petitioners. Thus, the court finds that, in this instance, the reassignments constitute a form of discipline which may only be effectuated pursuant to the procedures of EL §§ 3020 and 3020-a.[2]

The DOE likewise cannot skirt the disciplinary procedure requirements by claiming that petitioners failed to meet a condition of employment in failing or refusing to be vaccinated. Courts have indicated that the dismissal of New York City employees or placement of the employees on leave without pay for failure to comply with the Vaccine Mandate Order, without first undergoing statutory disciplinary procedures, is permissible since non-vaccination constitutes a failure to satisfy a "condition of employment" as opposed to misconduct. *See New York City Mun. Labor Comm. v City of New York*, 75 Misc 3d 411, 415 (Sup Ct., NY County) ("all of the statutes which plaintiffs point to prescribe the procedures for removal of a protected

---

[1] Placement of a tenured teacher in a reassignment center is not dissimilar to a suspension with pay, which is allowable "pending a hearing on the charges and the final determination thereof." EL § 3020-a (2)(b).

[2] To the extent the court in *Matter of McElroy v Board of Educ. of Bellmore-Merrick Cent. High School Dist.*, 5 Misc 3d 321 (Sup Ct, Nassau County 2004), determined that the reassignments of the petitioners therein did not amount to discipline, this court is not bound by a court of coordinate jurisdiction and the facts of said case are otherwise distinguishable from this matter.

employee charged with delinquencies in the performance of his [or her] job. Since the terminated employees' failure to be vaccinated is unrelated to the performance of their job, these statutes simply do not apply") (citations and internal quotation marks omitted); *O'Reilly v Bd of Educ. of the City School Dist. of the City of New York*, 2022 NY Slip Op 30173[U], **3-4 (Sup Ct, NY County 2022) ("The Court agrees with respondents that placing petitioner on leave without pay was not discipline under the Education Law and instead was merely a response to petitioner's refusal to comply with a condition of employment . . . Discipline involves alleged misconduct, not a prerequisite to doing the job in the first instance"). However, this matter does not involve a situation where petitioners' failure or refusal to comply with the Vaccine Mandate Order is at issue. Instead, petitioners maintain that they have, in fact, complied with the mandate and that the allegations are false. The DOE's decision to place petitioners on leave without pay (and subsequent reassignment) was not grounded in the undisputed failure or refusal of petitioners to be vaccinated, but in an accusation based on information gleaned from outside agencies that the Vaccination Cards uploaded by petitioners were probably fraudulent. Submission of fraudulent Vaccination Cards could clearly be characterized as misconduct, if not a crime. While petitioners, in such instance, would have also failed to satisfy a condition of employment, that failure would be inextricably intertwined with an act of misconduct, thus triggering the disciplinary procedure requirements of EL §§ 3020 and 3020-a. The DOE cannot cloak a misconduct claim in a failure to satisfy a condition of employment claim as means to avoid its obligation to afford the tenured petitioners their rights under the statute.

Accordingly, petitioners have demonstrated that the DOE's initial placement of tenured petitioners on leave without pay, and subsequent reassignment, was in violation of their rights under EL §§ 3020 and 3020-a, and therefore arbitrary and capricious. Furthermore, the tenured

8

petitioners have demonstrated their entitlement to permanent injunctive relief to prevent future and continuing violations of their rights under EL §§ 3020 and 3020-a. *See 144-80 Realty Assocs.*, 193 AD3d at 725; *Merkos L'Inyonei Chinuch, Inc. v Sharf,* 59 AD3d at 408. In this regard, the court finds that the petitioners have demonstrated a danger of irreparable harm resulting from their continued absence from the classroom, and that the equities balance in their favor.

In light of this court's determination that the DOE's actions were in violation of EL §§ 3020 and 3020-a, the court sees no need to address petitioners' argument that such action was also in violation of petitioners' due process rights under article 1, section 6 of the New York State Constitution.

Accordingly, petitioners' orders to show cause, motion sequences 1 and 2, are granted as to the tenured petitioners to the following extent:

It is hereby

**ORDERED, ADJUDGED AND DECLARED** that 1) the respondent DOE's initial determination placing tenured petitioners on leave without pay, and subsequently assigning them to reassignment centers, was in violation of the tenured petitioners' rights pursuant to EL §§ 3020 and 3020-a, and 2) that the DOE's determination is hereby declared null, void, and unenforceable; and it is further

**ORDERED** that tenured petitioners shall be reinstated to the assignments they held prior to their placement on leave without pay on April 19, 2022; and it is further

**ORDERED** that tenured petitioners shall be awarded any back pay withheld during the period they were placed on leave without pay; and it is further

9

**ORDERED** that the DOE is permanently enjoined from placing tenured petitioners on leave without pay or reassigning them to reassignment centers without the DOE first commencing disciplinary procedures pursuant to EL §§ 3020 and 3020-a; and it is further

**ORDERED** that the motions are in all other respects denied.

The foregoing constitutes the decision, order and judgment of the court.

E N T E R:

<del>HON. GINA ABADI</del>
J.S.C.

2022 DEC 30  AM 9: 43

KINGS COUNTY CLERK
FILED

10

<u>MEMORANDUM OF UNDERSTANDING</u>

Between

The Board of Education of the City School District of the City of New York (the "DOE" or "Board")

And

The United Federation of Teachers, Local 2, AFL-CIO (the "UFT")

(the "Agreement")

WHEREAS, the nation is currently in the middle of a novel coronavirus disease 2019 ("COVID-19") pandemic; and

WHEREAS, on March 7, 2020, the Governor of the State of New York declared a disaster emergency for the State of New York related to COVID-19; and

WHEREAS, on March 12, 2020, the Mayor of the City of New York declared a state of emergency for New York City related to COVID-19; and

WHEREAS, on March 13, 2020, the President of the United States proclaimed the COVID-19 outbreak in the United States a national emergency; and

WHEREAS, DOE school buildings will be closed to students from March 15, 2020 until at least April 20, 2020; and

WHEREAS, the DOE and the UFT wish to work collaboratively to preserve the continuity of learning for students to the greatest extent possible during this time of unprecedented crisis; and

WHEREAS, the DOE and the UFT recognize that there will be a need for flexibility during this period of interruption and an ability to adapt to changing circumstances as they may arise;

NOW, THEREFORE, the DOE and the UFT hereby agree that:

1. Any modifications to the terms and conditions of employment for UFT members, and all processes set forth the in the collective bargaining agreements, or any other agreements, that are made in relation to the COVID-19 pandemic and the DOE response thereto have been agreed to as a precautionary measure in response to the global emergency and to ensure the safety of staff and to preserve the continuity of learning for the students of New York City to the greatest extent possible.

2. Any such modifications shall not be precedential.

3. The parties may agree to rescind or alter any such modifications as COVID-19 circumstances change, or as otherwise necessary or appropriate.

4. Any Operational Issues, as defined by the collective bargaining agreement, or any other issues related to remote learning working conditions,  that arise during the remote learning period resulting from the COVID-19 pandemic shall be resolved through the Paperwork and Operational Issues process set forth in Article 8(I) of the UFT-Board Collective Bargaining Agreement Covering Teachers as modified by Paragraph 6 of the October 11, 2018 Memorandum of Agreement between the parties, with the following modifications:

    a. The Chapter Leader and Principal will have 2 school days to resolve a complaint raised by a member

    b. The District Representative and the District Superintendent will have 2 school days to resolve a complaint that cannot be resolved at the school level, the Central Committee will be copied on any complaints that are elevated to the district level;

    c.   The Central Committee will meet remotely on a weekly basis, or earlier if critical, during the  remote learning period, as necessary, to resolve any complaints that cannot be resolved at the district level.

5. In the event that the Central Committee cannot agree on the resolution to any such issues, the issue shall be referred to the UFT President and the Chancellor or their designees for resolution.

6. This agreement is in effect for the duration of the remote learning period that is in effect in response to the COVID 19 pandemic and shall expire at the end of this remote learning period unless the parties agree otherwise in writing.


AGREED and ACCEPTED, on this ___ day of March, 2020, BY:

For the UFT:

_____
Beth A. Norton, General Counsel


For the DOE:

*Howard Friedman*
_____
Howard Friedman, General Counsel