

**MARIA RUSCELLI**
2550 Independence Avenue, Apt 3M
Bronx, N.Y. 10463
917-805-1232
mariaruscelli@gmail.com

April 18, 2024

Hon. Judge Ann M. Donnelly
United States District Court for the
Eastern District
225 Cadman Plaza East, Courtroom 4G
Brooklyn, N.Y. 11201

RE: **Ruscelli v Department of Education** No. 23-CV-07475 (AMD) (LB)

Dear Judge Donnelly,

My name is Maria Ruscelli, and I am the Plaintiff in the above cited matter before you. I am pro se, but felt compelled to write this letter to clarify and enlarge the irrational and unjustifiable claim in the Defendant's Motion To Dismiss on p. 10: "Enforcement of the Vaccine Mandate is not a disciplinary action" and again p. 9 in the Defendant's Reply. As you know, I wrote in my Complaint and in my Opposition to the Motion To Dismiss that the actions taken against me such as putting me on a leave without pay, placing a Problem Code on my file and fingerprints, and terminating me without Just Cause arbitration known as §3020-a arbitration are disciplinary actions designed to punish me for my religious beliefs which prohibit my taking the vaccine into my body.

The media exposure of the Problem Code – which was unknown when the Broecker case was filed – let the world in on the terribly stigmatizing punishment of this Code for anyone who challenges any policy, rule or whim of an administrator working in New York City. The problem code is shared by principals and Superintendents, and is open to

1

review by anyone who works for the United Federation of Teachers ("UFT") or any other Union, municipal agency or vendor. My good name has been sullied for no just reason but for my sincere religious beliefs.

I did not, in my Opposition paper, state a cause of action challenging the validity and Constitutionality of the vaccine mandate. I did, however, oppose the *procedures used* to implement the mandate, which deprived me of my right to due process in a Just Cause arbitration known as "3020-a" after the statute upon which it stands. (Education Law 3020-a). May I remind your Honor that Education Law §3020-a holds at its' core that tenure is public policy and the rights given by tenure cannot be taken away unless by the State legislature. Here, there has been no legislative decision by the State to unravel the tenure rights in honor of a temporary City COVID Vaccine Mandate which is now ended, closed, kaput.

Public policy in New York State and City require tenured teachers such as myself to be given a full and fair hearing called Education Law §3020-a arbitration before my salary is reduced or taken from me. The Defendant has always fought against tenure rights and due process because it interferes with their total control over firing anyone for any reason at any time. The Appeal process set up by Martin Scheinman and his army of arbitrators who work for his company, Scheinman Arbitration and Mediation Services, was thrown out as "Constitutionally unsound" by this very court, not me. I had no standing to submit any opposition to the Scheinman Award to PERB, but I can certainly argue in favor of the Scheinman process being declared unconstitutional, in this very same Court.

2

The second panel, the Citywide Appeals Board, was no better. This Panel was shrouded in mystery and their conclusions handed out without any details as to why the panel members came to the conclusions that they did.

Indeed, this Panel was not a §3020-a hearing in shape or form by any stretch of the imagination. No applicant for a religious exemption was allowed to testify about his/her/their religious beliefs in front of the panel. No explanation was ever given about the meaning of "undue hardship", and I never waived my right to have a §3020-a hearing before being removed from salary after a Probable Cause hearing and/or being terminated after a full 3020-a arbitration.

In sum, I want this Court to be very aware that my tenure status gives me a property right to my job that requires strict scrutiny when removed for any reason. The Motion To Dismiss and Reply give this Court no substantial grounds to be granted. Moreover, the Defendant never offered any reasonable accommodation that would both uphold my right to my religious beliefs as well as Defendant's concern for maintaining a safe environment for in-person learning. There were multiple ways that Defendant could have placed me in a "rubber room" reassignment until the mandate ended, or have me tested weekly while working in an administrative position. The two-words "undue hardship" are merely a pretext for discrimination. Just saying there is an undue hardship does not make it so.

Thank you,

Respectfully,

*[signature]*
Maria Ruscelli

CC: Madeleine A. Knutsen (by mail and email)

STATE OF NEW YORK
COUNTY OF KINGS
SIGNED BEFORE ME ON 4/18/2024
MARIA ISABEL PURCELL

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2027

3

## Education Due Process-NOT!
### (Cardinale v. D.O.E. ___ Misc. 3d ___ [Sup. Ct. 2018]
by Roger Bennet Adler

Labor and Employment Law Journal, fall, 2019 Vol. 44, p.44

The legislative enactment and bureau implementation of "mayoral control" at the New York City Department of Education (D.O.E.) during the administration of Mayor Michael Bloomberg ended what many viewed as an unwieldy and disruptive management by the former New York City Board of Education. Once it was enacted into law, however, numerous changes and adjustments were, of necessity, required to facilitate its implementation.

Not addressed, however, was how Education Law Article 52-a, addressing mayoral control, impacts upon the due process rights enumerated in Education Law Section 3020-a(2) would be addressed. During the ensuing time period, D.O.E. crafted and implemented a "delegation model," under which the power to levy employee terminating charges was delegated from the Schools Chancellor's Office ("Tweed") to the individual school District Superintendents, and, in turn, by the District Superintendents to individual district school principals.

Each individual school principal, the D.O.E. Schools Chancellor determined, was now empowered to both investigate, and initiate a job terminating 3020-a proceeding, with neither the advice, or consent, of the District Superintendent (or the Schools Chancellor). The principals were afforded unilateral power to now interact with their employees, who viewed each directive as potentially prompting an investigation or campaign leading to termination.

On April 4, 2018, all of this came crashing down in Richmond County Supreme Court Justice Desmond Green's Staten Island courtroom, when Justice Green unexpectedly ruled in favor of Ms. Cardinale, and against the D.O.E. Justice Green held that the D.O.E. practice of delegating termination charges to a school principal violates Education Law Section 3020-a(2).

## BACKGROUND

Section 3020-a is, I note, codified in Education Law Article 61, whereas Section 2590 is found in Education Law Article 52(a). This placement dichotomy is, I respectfully submit, not a mere trivial distinction, but rather reflects both a legislative determination (and intent) to expressly separate the garden variety powers of the Chancellor from the statutory due process template applicable to the termination of tenured teachers.

Job termination is both a vital, and valued contractual right for tenured teachers, and stands separate and apart from the Education Law article (Article 52(a)) addressing "mayoral control" of city schools. Tenured teachers were clearly not the intended primary target (or subject) of those legislators who granted former Mayor Michael Bloomberg the powers he sought to take back from the former Board of Education.

Prior to Justice Green's decision, a number of D.O.E. arbitrators rejected this argument:

| CASE | COUNTY | COUNSEL |
| --- | --- | --- |
| Menchin | Rockland | Perkins-Cline, LLP |
| White-Grier | New York | pro se |
| Pina-Pena | New York | unclear |
| Free | New York | Behrins |

In *White-Grier v. Department of Education*, the Court rejected the Respondent's contention that the multiple delegations from Chancellor to Superintendent (and from Superintendent to school principal) was appropriate and proper, and cited Education Law Section 2590(f)(1)(b).

The D.O.E.'s predictable "pushback" omits any discussion addressed to the State Legislature's noticeable failure to amend Education Law Section 3020-a to include a provision detailing the removal of tenured personnel. If the Legislature intended to dramatically alter the prophylactic protection enjoyed by tenured pedagogues, it would, I submit, have done so both clearly, and unequivocally – i.e. a new subdivision for cities of one million or more would have sequentially followed subd. (2), and trumpeted such a tectonic change. It, however, clearly doesn't!

The clear "upshot" is that the State Legislature recognized the delegation of many <u>ministerial</u> tasks, minor duties, and responsibilities, <u>except</u> that of the <u>termination</u> of employment of tenured faculty and principals, retaining them in 3020-a.

Nothing contained in the Legislation authorizing mayoral control suggests the Legislature knew (much less sanctioned) the power to initiate termination by a dramatic downward delegation to a mere school principal. Indeed, such lesser tasks as reviewing unsatisfactory ratings are conducted by designated hearing officers, and reviewed by a deputy Schools Chancellor at "Tweed."

Since the burden of proof remains on the D.O.E., its current "delegation argument" is predicated upon a mixture of speculation, mixed with bureaucratic "empire building." Instead of a Senior Board member dispassionately applying a 3020-a, the D.O.E. has breathtakingly downgraded the charging process from a high level mayoral appointee, to minor school principals.

Finally, to credit the D.O.E. Counsel's Office "delegation model," there are now two distinct and free-standing versions of pedagogical due process in New York State. For those teachers employed in the 57 counties outside New York City, the traditional 3020-a due process applies with high level review required before a principal's termination application is initiated.

Once one, however, crosses the Bronx or Queens County lines, that modicum of due process simply evaporates, and school principals act as the equivalent of both a pedagogical investigator and grand jury. Two separate systemsm existing side by side dependent solely if the teacher works for the D.O.E. or elsewhere. This distinction, I submit, creates a "suspect classification" (and disparate treatment), denying New York City teachers equal protection of the law, as guaranteed by Article 1, Section 11 of the New York State Constitution (see *Board of Education Levittown Union Free School District v. Nyquist*, 83 A.D. 217, 234-239, 443 N.Y.S 2d 843 [2nd Dept. 1981, per Lazer, J.]). It is essentially a return to a "separate but equal" approach to education (see *Plessy v. Ferguson*, 163 U.S. 537 [1896]), long discredited in cases like *Brown vs. Board of Education*, 347 U.S. 483 [1954], addressed to racial discrimination.

The contest for mayoral control over public education was hard fought, and deeply political. The vacatur of the old Board of Education (B.O.E.) consolidated power formerly exercised by the B.O.E. It is hardly obvious that the Legislature's decision to allow the Schools Chancellor to exercise these powers to delegate these significant disciplinary responsibilities not to Deputy Chancellors, but to District Superintendents, and in turn to a school principal. Indeed, no principal is professionally trained, much less capable, of applying a disciplinary process which is fair and uniform.

## DUE PROCESS AND EQUAL PROTECTION

The Education Law Section 3020-a statutory protocols established a series of legal protections against vindictive or episodic administrators seeking to use the threat of sanctions to jawbone teachers to bend to their will of supervisory personnel with the power to issue annual "performance ratings" to compel compliance.

Accepting that New York City mayoral control was primarily driven by the cost and dysfunctionality of the former Board of Education (B.O.E.), the notion that curtailing terminating 3020-a protections was never an advanced component of legislative change. While there were periodically voiced concerns addressing the difficulty of terminating seriously poorly performing pedagogues, such concerns were not the primary driver of mayoral control.

Not unlike the post-Civil War resistance to civil rights for black Americans, which created a "separate but equal" template, the years preceding the U.S. Supreme Court's decision in *Brown v. Board of Education*, supra., realized that while there was governmentally forced separation, there was no comparable equality.

The current 3020-a template has two separate models – in 57 of the state's counties 3020-a is the law of the state. For the five counties constituting New York City, it is a truncated model, in which principals simultaneously act as investigator and Grand Jury. There is no existing check and balance in place to insure that principals are not improperly using annual ratings to coerce teachers to compromise pedagogical integrity. Those in Nassau to the east, and Westchester to the north receive full 3020-a due process. Their brothers and sisters to the west in Queens and

3

south in the Bronx receive far less. Why separate? Why glaringly unequal? (see *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 [2000]).

## A POSSIBLE SOLUTION

New York City's naked "power grab" is not foreordained to continue unabated. Those who perceive the sting of injustice have an available legislative remedy. A "template for reform" can *inter alia* constitute an amendment to Education Law 3020-a focusing on the due process rights for tenured teachers in cities of one million or more.

It could require that, where terminable conduct is suspected by the Principal, it is referred to S.C.I. for investigation. If a legal basis (probably cause) for potential termination is found, the case can be referred to the appropriate District Superintendent. Should the Superintendent agree, a 3020-a charge would be referred to a designated Deputy Chancellor. If approved, a 3020-a charge could be filed.

In terms of adjudication, rather than the current Arbitrator system, cases would be presented to a single New York City Administrative Law Judge, paid an annual salary, not *per diem* compensation. Court Reporters (not electronic recording devices) would be utilized. Tenured teachers would enjoy a "Presumption of Competence." The right to confront and cross-examine witnesses would be guaranteed, and hearsay evidence prohibited. The statements of D.O.E. witnesses would be provided to the Respondent's counsel one week prior to the start of the hearing at a final conference. Stipulations would be sought, and documents pre-marked, the need to lay evidentiary foundations, and conduct *voir dire* would be eliminated.

The burden of proof would be altered from a bare "preponderance of the evidence" to "clear and convincing" evidence. Following the conclusion of the testimonial phase and closing arguments, findings would be rendered. They would be subject to judicial review in an Article 78 proceeding in State Supreme Court, in the county where the teacher taught, and the charges arose.

For those exercising their contractual right to seek review of an unsatisfactory U rating, the report of the Hearing Officer, which is provided to the Deputy Schools Chancellor, should, if only as a function of "transparency," be provided to the appealing employee – if only to provide context for the Deputy Chancellor's ruling, and to assist the court if Article 78 relief is judicially sought. The current system is shrouded in mystery, likely to hide the low rate of the Deputy Chancellor's rulings in favor of those D.O.E. employees who appeal.

The days when due process on Gold Street too often resembles the "Spanish Inquisition," when rank hearsay evidence is permitted, and "kangaroo court" protocols taken for granted, it is clearly time to recapture both dignity, and fairness, and speak "truth to power." Transparency is not a component of D.O.E.'s D.N.A. It is time to appropriately level the 3020-a playing field by injecting due process in the proceeding..

4

Reform now – not later!

*Roger B. Adler is a solo Manhattan practitioner who has represented teachers and school administrators in both Education Law Section 3020-a proceedings, and in connection with C.P.L.R. Article 78 proceedings.*